804 F.2d 1418
 7 Employee Benefits Ca 2747
 Allen H. CUNHA, Jr., George L. Gonsalves, Richard G. Lowry,
Janet Leuenberger, Leoda Aguiar, Joseph W. Alana, Jr.,
Haruye Anamizu, Joseph Cabral, Hilton W.C. Chong, Bernard L.
Galdeira, C. Elaine Jackson, Herbert S. Kruse, Alvin J.
Medeiros, et al., Plaintiffs-Appellants,
v.
WARD FOODS, INC., Defendant-Appellee.
 No. 84-1979.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Nov. 19, 1985.
Decided Nov. 21, 1986.
 
 Edward C. Kemper, Honolulu, Hawaii, for plaintiffs-appellants.
 Robert Katz, Jamie A. Chuck, Honolulu, Hawaii, for defendant-appellee.
 Appeal from the United States District Court for the District of Hawaii.
 Before SKOPIL, FLETCHER and ALARCON, Circuit Judges.
 FLETCHER, Circuit Judge:
 
 
 1
 Former employees of Ward Foods' Honiron Division appeal the district court's judgment limiting damages for Ward's negligent misrepresentation of its pension plan to the employees' "out-of-pocket" losses. The employees also challenge the district court's grant of summary judgment on two counts of their complaint, and the granting of directed verdicts on four other counts. The employees also contest certain evidentiary rulings during trial, and decisions on jury instructions.
 
 
 2
 We affirm the district court in part, and reverse and remand in part.
 
 FACTUAL BACKGROUND
 
 3
 In 1964, Honolulu Iron Works (Honiron), sometime before it was acquired by defendant Ward Foods, Inc., replaced its "pay-as-you-go" pension plan with a new "funded" plan (the Plan). The company newsletter, the "HONIRONEWS", and an employee brochure described the Plan to employees. The HONIRONEWS explained that a funded pension plan provided greater security, because it was not dependent upon the company's current financial condition. The newsletter declared that "no disaster or change of management can reduce or eliminate your pension." The employee brochure and company officials reaffirmed the attractiveness of the Plan.
 
 
 4
 We summarize the terms of the Plan briefly here. Under the original Plan, employees contributed three and one-half percent of wages over $400. However, in 1971 an amendment made the Plan noncontributory. The company agreed to "make[ ] such contributions to the Trust Fund which are necessary to maintain the Plan in full force and effect under the terms of the Internal Revenue Code." An employee with ten or more years of service who reached age 45, would receive benefits beginning at age 65. An employee could elect early retirement at age 55. In Article XIII, Ward reserved the right to "change, modify, amend, suspend, or discontinue the Plan at any time except as modified by any Labor Agreement between [Ward] and the Union."
 
 
 5
 All of the employees in this action joined the Plan, claiming that they did so in reliance on Ward's representations concerning its security and stability. The employees testified that they read the newsletter and pension brochure, but that with the exception of one plaintiff, Elaine Jackson, they never saw the actual Plan document, which was on file in Honiron's office. They testified that Ward's oral and written representations concerning the Plan misled them to think that Ward was guaranteeing full payment of pensions, under all circumstances.
 
 
 6
 In 1973, Ward began liquidating Honiron's operations. Although most employees, including the plaintiffs, were terminated by September 1973, the Plan continued in existence.
 
 
 7
 On August 27, 1974, the Wyatt Company, the Plan's actuarial consultant, wrote Ward to inform the company about certain aspects of the new Employee Retirement Income Security Act of 1974 (ERISA). Wyatt advised Ward that under the legislation, if a pension plan terminated after July 1, 1974, the Pension Benefit Guaranty Corporation (PBGC) would guarantee accrued plan benefits without employer liability. However, if a plan terminated after September 2, 1974, the employer would be required to repay the PBGC up to thirty percent of the company's net worth to cover vested pension obligations.
 
 
 8
 On August 31, 1974, Ward terminated the Honiron Plan. Ward then applied for PBGC's insurance. The PBGC ruled that Ward had not provided substantial evidence to show that there was a reasonable business purpose behind the Plan's termination. Because the apparent motive for termination was to avoid liability and obtain the PBGC guarantee, the Ward application was denied.
 
 
 9
 Under Article XIII's terms, participant rights would vest immediately upon Plan termination. To the extent available, assets would be distributed first to retired participants. Any remaining assets would then be distributed, without preferential treatment, to participants eligible for early retirement (the "55+ Group") and to those with vested pension rights (participants who were 45 years old with ten years of service, the "45 & 10 Group"). At the time of Plan termination, Honiron pension fund assets were insufficient to pay accrued benefits to retired employees, and there were no assets to pay benefits to the 55+ Group or the 45 & 10 Group.
 
 
 10
 After termination, Ward took the total available Plan assets and purchased annuity policies with Bankers Life Insurance Company. These funds were sufficient to purchase a policy that would provide employees who had retired with seventy-five percent of the benefits to which they were entitled under the Honiron Plan. Using its corporate assets, Ward purchased an additional annuity policy to make up the remaining twenty-five percent of benefits due. Ward purchased another annuity to provide benefits to individuals in the 55+ Group. The 45 & 10 Group received refunds of their contributions, but no annuity. All of the plaintiffs in this action are former Honiron employees in the 45 & 10 Group (the Employees).
 
 
 11
 In 1977, the Employees sued Ward and Wyatt in state court, and the defendants removed the action to federal court on diversity grounds.[1] The employees' Second Amended Complaint contained twenty-four claims, alleging: breach of contract; violations of fiduciary duties; federal and state securities law violations; fraudulent and negligent misrepresentation; state law unfair trade practices; and ERISA violations.
 
 
 12
 Several claims were dismissed on summary judgment, see Cunha v. Ward Foods, Inc., 545 F.Supp. 94, 102 (D.Haw.1982); Cunha v. Ward Foods, 501 F.Supp. 830, 837 (D.Haw.1980); and others were dismissed on directed verdicts. At trial the jury found Ward liable for negligently misrepresenting the Plan to the Employees. The jury found against the Employees on the breach of contract issues.
 
 
 13
 The trial court awarded no damages for Ward's negligent misrepresentation, however. The trial court ruled that out-of-pocket costs represented the appropriate measure of damages, and that because the Employees' contributions, with interest, had already been returned, the Employees' claim must be dismissed.STANDARDS OF REVIEW
 
 
 14
 This court reviews the district court's determination of Hawaii state law de novo. Matter of McLinn, 739 F.2d 1395, 1403 (9th Cir.1984) (en banc).
 
 
 15
 In reviewing the grant of summary judgment, our task is identical to that of the district court. Water West, Inc. v. Entek Corp., 788 F.2d 627, 628 (9th Cir.1986). We view the evidence and inferences de novo, in the light most favorable to the non-moving party, and determine whether the district court correctly found that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. Id. at 628-29.
 
 
 16
 Similarly, in reviewing a district court's directed verdict, our role is identical to that of the district court. A directed verdict is proper if the evidence permits only one reasonable conclusion. We examine the evidence in the light most favorable to the non-moving party to decide whether substantial evidence could support a finding in that party's favor. Othman v. Globe Indemnity Co., 759 F.2d 1458, 1463 (9th Cir.1985).
 
 
 17
 We review for an abuse of discretion the trial court's decisions concerning the admission of evidence, Maddox v. City of Los Angeles, 792 F.2d 1408, 1412 (9th Cir.1986), and the formulation of jury instructions, United States v. Wellington, 754 F.2d 1457, 1463 (9th Cir.), cert. denied, --- U.S. ----, 106 S.Ct. 593, 88 L.Ed.2d 573 (1985). This court will uphold a trial court's decision to admit or exclude expert testimony unless it is manifestly erroneous. Taylor v. Burlington Northern R.R. Co., 787 F.2d 1309, 1315 (9th Cir.1986).
 
 DISCUSSION
 
 18
 In 1974, Congress enacted the Employee Retirement Income Security Act (ERISA), 29 U.S.C. Sec. 1001 et seq. Congress' primary purpose in enacting this comprehensive legislative scheme was "to prevent the 'great personal tragedy' suffered by employees whose vested benefits are not paid when pension plans are terminated." Nachman Corp. v. Pension Benefit Guaranty Corp., 446 U.S. 359, 374, 100 S.Ct. 1723, 1732, 64 L.Ed.2d 354 (1980) (footnotes omitted); see United Steelworkers of America v. Crane Co., 605 F.2d 714, 717 (3d Cir.1979).
 
 
 19
 The case before us illustrates vividly the problems prevalent in contractual pension arrangements between employers and employees that caused Congress to enact ERISA's protections. However, for those plans, such as Honiron's, that terminated prior to ERISA's effective date, we are governed, albeit reluctantly, by the terms of the parties' contract, not ERISA's protective mantle. See Nachman, 446 U.S. at 382, 100 S.Ct. at 1736; United Steelworkers, 605 F.2d at 717; Dwyer v. Climatrol Industries, Inc., 544 F.2d 307, 309-11 (7th Cir.1976), cert. denied, 430 U.S. 932, 97 S.Ct. 1553, 51 L.Ed.2d 776 (1977).
 
 
 20
 A. Proper Measure of Damages for Negligent Misrepresentation
 
 
 21
 The Employees contend that they are entitled to receive the full value of their pensions or, "benefit-of-the-bargain" damages for Ward's negligent misrepresentations. Hawaii law governs the damages issue. See Tenneco West, Inc. v. Marathon Oil Co., 756 F.2d 769, 771 (9th Cir.), cert. denied, --- U.S. ----, 106 S.Ct. 134, 88 L.Ed.2d 111 (1985).
 
 
 22
 The district court stated that Hawaii law was uncertain, but it concluded that the Supreme Court of Hawaii would follow the Restatement (Second) of Torts' position, which limits recovery for negligent misrepresentation to "out-of-pocket" damages.[2]
 
 
 23
 The Hawaii Supreme Court has not ruled definitively regarding allowable damages in negligent misrepresentation cases. Under these circumstances, the federal court sitting in diversity reasonably must attempt to determine how the highest state court would rule. We must base the decision on "statutes, treatises, restatements and published opinions." Molsbergen v. United States, 757 F.2d 1016, 1020 (9th Cir.), cert. dismissed, --- U.S. ----, 106 S.Ct. 30, 87 L.Ed.2d 706 (1985).
 
 
 24
 Although Hawaii courts have not formulated a rule, the courts have twice cited the Restatement's view on negligent misrepresentation with approval. Most recently, in Shaffer v. Earl Thacker Co., 716 P.2d 163, 165 (1986), the appellate court relied on the Restatement (Second) of Torts Sec. 552 (1977) [hereinafter cited as the "Restatement"] in holding that an action for negligent misrepresentation could be brought for misrepresentations by a seller's real estate agent to a prospective buyer. Because the action was before the court on summary judgment, the court never reached the issue of damages. However, the court quoted Secs. 552 [liability] and 552 B [damages], indicating that these sections contained "the material elements of the tort of negligent misrepresentation." Id.
 
 
 25
 Earlier, in Chun v. Park, 51 Haw. 462, 462 P.2d 905 (1969), which involved a title company's failure to discover an existing second mortgage during a title search, the Hawaii Supreme Court had recognized the tort of negligent misrepresentation. The Chun court cited the Restatement with approval, stating that "[w]e believe Sec. 552 of Restatement (Second) of Torts (Tentative Draft No. 12, 1966) is a fair and just restatement of the law on the issue of negligent misrepresentation." 462 P.2d at 909. In Chun, the Court found that the title company could not be considered the proximate cause of damages suffered in transactions subsequent to that for which the title certificate had been issued. As a result, the Court denied the plaintiff's request for benefit-of-the-bargain damages arising out of a later sale of the house. Id.
 
 
 26
 In two cases involving fraudulent, rather than negligent misrepresentation, the Hawaii Supreme Court discussed both out-of-pocket and benefit-of-the-bargain recovery, but found it unnecessary to reach the issue. See State Savings and Loan Association v. Corey, 53 Haw. 132, 144, 488 P.2d 703, 711 (1971) (Hawaii Supreme Court, noting that some courts adopt a flexible rule in fraud cases, declined to adopt either approach at the time), cert. denied, 406 U.S. 920, 92 S.Ct. 2452, 32 L.Ed.2d 817 (1972); Ellis v. Crockett, 51 Haw. 45, 451 P.2d 814, 820 (1969) (same).
 
 
 27
 Thus, the Hawaii courts have never decided whether a benefit-of-the-bargain or out-of-pocket rule applies in negligent misrepresentation cases. However, the Chun and Shaffer courts emphasized that Hawaii respects the Restatement position on this subject.[3] We are confident that if confronted with this issue under the circumstances of this case, the Hawaii courts would apply the Restatement position.[4]
 
 
 28
 The Employees raise the additional argument that even if out-of-pocket damages normally should apply, we should use a more generous rule when the negligent party and injured party have a fiduciary relationship. We decline to adopt this suggestion. Our research has not uncovered, nor have the parties directed us to any Hawaii case suggesting such a rule.[5] The Employees have cited California authority for this proposition. See Walters v. Marler, 83 Cal.App.3d 1, 25-26, 147 Cal.Rptr. 655, 670-71 (1978). However, as the Walters court acknowledged, California courts had not applied this rule uniformly. See id. Because Walters found the damage award excessive under either an out-of-pocket or benefit-of-the-bargain theory, the court did not have to resolve the issue. Id. at 26, 147 Cal.Rptr. at 621. Moreover, the California Supreme Court cast considerable doubt on Walters 's holding. See Gray v. Don Miller & Associates, Inc., 35 Cal.3d 498, 674 P.2d 253, 198 Cal.Rptr. 551 (1984) (holding that the plaintiff could recover only actual damages for the defendant fiduciary's negligent misrepresentation; court cited Gagne v. Bertran, 43 Cal.2d 481, 275 P.2d 15, 22 (1954) with approval, a case that limited plaintiff to an out-of-pocket recovery); see also Overgaard v. Johnson, 68 Cal.App.3d 821, 825-27, 137 Cal.Rptr. 412, 414-16 (1977) (advocating flexibility in damages awards when a fiduciary relationship exists, but considering itself bound by Gagne 's out-of-pocket limitation).
 
 
 29
 We also note that other courts have not found the fiduciary status of the tortfeasor to be significant. See Freeman v. Jacques Orthopaedic & Joint Implant Surgery Medical Group, Inc., 721 F.2d 654, 655-56 (9th Cir.1983) (discussing possible damages remedies for an employer's misrepresentations about the pension plan and citing Restatement Secs. 549 [fraud] and 552B [negligence] as the applicable provisions); Sedco International, S.A. v. Cory, 522 F.Supp. 254, 323-24 (S.D.Iowa 1981) (the court concluded that the defendants, as special advisors and consultants, had "cultivated a relationship of trust and confidence" with the plaintiff; court stated that the plaintiff could recover out-of-pocket damages for negligent misrepresentations and benefit-of-the-bargain damages for fraudulent misrepresentations), aff'd, 683 F.2d 1201 (8th Cir.), cert. denied, 459 U.S. 1017, 103 S.Ct. 379, 74 L.Ed.2d 512 (1982).
 
 
 30
 Both Ward and the Employees rely upon Gediman v. Anheuser Busch, Inc., 299 F.2d 537, 543-44 & nn. 5-6 (2d Cir.1962). However, the Employees' reliance is misplaced. In Gediman, the court, citing Restatement Sec. 552 and New York law, awarded a plaintiff employee damages for the employer's negligent misrepresentation of the consequences of the employee's election of a pension option at retirement. In Gediman, pension advisors responded to the employee's written query, and voluntarily undertook to advise him of the effects of various available benefit elections. In so doing, the advisors negligently misrepresented the implications of the choices. The court awarded the plaintiff the difference between the option that the plaintiff would have selected had he not been swayed by the misrepresentations, and the actual amount payable under the option that the plaintiff did select. Gediman, 299 F.2d at 541, 548.
 
 
 31
 We agree with Ward that this amount does not represent benefit-of-the-bargain damages, i.e., the difference between what the plaintiff expected he would receive, had the defendant's representations been true, and the amount actually received under that option. Instead, he was awarded the difference between the value parted with at the time of the misrepresentation, and the value of what he received in return.
 
 
 32
 In our view, Hawaii would in this case look to the rationale set forth in the Restatement:
 
 
 33
 The considerations of policy that have led the courts to compensate the plaintiff for the loss of his bargain in order to make the deception of a deliberate defrauder unprofitable to him, do not apply when the defendant has had honest intentions but has merely failed to exercise reasonable care in what he says or does.
 
 
 34
 Restatement Sec. 552 B, comment (b). We therefore agree with the district court's refusal to award benefit-of-the-bargain damages for Ward's negligent misrepresentation.[6]
 
 
 35
 B. Summary Judgment on Count X--Violation of the Pension Plan
 
 
 36
 In Count X, the Employees claim that Ward breached the terms of Article XIII of the Plan by agreeing to purchase annuities for the 55+ Group while not treating the 45 & 10 Group identically.[7]
 
 
 37
 It is uncontested that when Honiron closed its plant, Ward gave employees in the 55+ category a choice of receiving either severance pay or a pension under the Honiron Plan. When the Plan terminated one year later, Ward once again decided to offer those employees eligible for early retirement the option of severance pay or a retirement benefit. The Banker's Life annuities, voluntarily purchased with corporate assets, provided this benefit to those employees who elected not to receive the severance pay.
 
 
 38
 The district court held, as a matter of law, that Plan provisions pertaining to distribution priorities did not apply to these corporate assets used to purchase additional benefits for 55+ Group members after the Plan already had terminated. The district court stated that any guarantees that Ward made to the 55+ Group to provide such benefits were irrelevant to the Employees' claims. The court reasoned that the Employees' contractual rights were defined by the Plan itself, and not by Ward's extrinsic promises to the 55+ Group. Cunha, 545 F.Supp. at 96.
 
 
 39
 We find no error in the district court's decision. Had the court found that Ward used plan assets to discriminate in favor of the 55+ Group, this clearly would have constituted a violation of the Plan's terms. See Hardy v. H.K. Porter Co., 417 F.Supp. 1175, 1184 (E.D.Pa.1976).
 
 
 40
 Similarly, had the funds that Ward used represented corporate assets that Ward legally was required to contribute to the Plan prior to termination, but did not, then this too might have constituted illegal discrimination. However, these are not the facts before us.
 
 
 41
 The Plan distribution requirement prohibited any discrimination in the allocation of Plan assets between the 55+ and 45 & 10 Group at termination. In this case, there were no Plan assets to distribute to participants other than those who had retired. Nothing in Article XIII can be construed as a prohibition against treating the 55+ Group differently, provided that the preferential treatment did not involve Plan assets. Ward's conduct in this case had the same legal effect as if Ward had decided to issue across-the-board severance checks to eligible 55+ Group members and not to the 45 & 10 Group employees. That Ward provided an option of severance pay or an annuity does not change the analysis. Those employees who opted for the annuity did not receive the severance pay to which they otherwise were entitled.
 
 
 42
 We hold that Ward's decision to allocate corporate monies, that were never Plan assets and that Ward never had any obligation to contribute to the Plan, see infra Section C(2), to provide a benefit for former participants after Plan termination, did not violate the Plan's terms.[8]
 
 C. Directed Verdicts on Counts XI and XXIV
 
 43
 In Count XI, the Employees allege that Ward's termination of the Plan on August 31, 1974 without prior notice to union members was unlawful. The claim is based on language included in the Plan, and in a separate labor agreement executed by Ward and various unions.
 
 
 44
 Article XIII of the Plan gives the company the right to "change, modify, amend, suspend, or discontinue the Plan at any time except as modified by any Labor Agreement between the Company and the Union. (emphasis added).
 
 
 45
 An August 1971 labor agreement, to which three labor unions and Ward were parties, provides in part:
 
 
 46
 With respect to those employees in the respective collective bargaining units represented by said unions,
 
 WITNESSETH
 
 47
 Whereas the parties hereto have agreed that this Pension Plan, a copy of which is attached and made a part hereof ... shall apply to said employees;
 
 
 48
 It is mutually understood and agreed as follows:
 
 
 49
 1. Honiron, Division of Ward Foods, Inc. will maintain the Plan in full force and effect under the applicable sections of the Internal Revenue Code until June 30, 1974. This agreement shall be deemed renewed for successive three (3) year periods after June 30, 1974, unless any party hereto, within the period hereinafter designated, gives notice to the other parties hereto of his desire to amend, modify, or terminate this agreement, which notice shall be served not earlier than seventy-five (75) days nor later than sixty (60) days prior to June 30, 1974, or to succeeding termination dates at three (3) year intervals in case notice was not served within the period designated.
 
 
 50
 Count XI appears to assert third party beneficiaries' rights under the separately negotiated union/Honiron agreement. However, the Employees argued before the district court that Article XIII's language incorporates by reference the labor agreement's notice provision.
 
 
 51
 The Employees contend that the labor agreement's notice provision modified the Plan for all Plan participants, and not only as applied to union members. Ward counters that the Employees have no rights under the labor agreement, and that the effect of that agreement was to preclude termination of the Plan without notice only with respect to union members.[9] The district court found the Plan's language ambiguous and refused to grant summary judgment. See Cunha, 545 F.Supp. at 97. At trial, however, the court directed a verdict in Ward's favor.
 
 
 52
 Interpretation of a contract presents a mixed question of law and fact. Whether ambiguity exists is a question of law. See State Farm Mutual Automobile Insurance v. Fernandez, 767 F.2d 1299, 1301 (9th Cir.1985). If ambiguity does exist, then the court must determine the parties' intent, which presents a question of fact. DiTullio v. Hawaiian Insurance & Guaranty Co., 1 Hawaii App. 149, 616 P.2d 221, 226 (1980).
 
 
 53
 An ambiguity exists when there is doubt as to what written words mean. Government Employees Insurance Co. v. Franklin, 66 Haw. 384, 662 P.2d 1117, 1119 (1983); MPM Hawaiian, Inc., v. World Square, 4 Haw.App. 341, 666 P.2d 622, 626 (1983). When a document incorporates outside material by reference, the subject matter to which it refers becomes a part of the incorporating document just as if it were set out in full. See State v. Hawaiian Dredging Co., 48 Haw. 152, 397 P.2d 593, 606 (1964).
 
 
 54
 The 1971 labor agreement modified Ward's right to terminate the Plan "[w]ith respect to those employees in the respective collective bargaining units represented by said unions." (Emphasis added).[10] Although the parties concede that none of the Employees were members of the signatory unions, the record is unclear regarding whether any non-union employees were included in the collective bargaining units represented by the unions. See Wallace Corp. v. NLRB, 323 U.S. 248, 255, 65 S.Ct. 238, 241, 89 L.Ed. 216 (1944) ("The duties of a bargaining agent ... extend beyond the mere representation of the interests of its own group members. By its selection as bargaining representative, it has become the agent of all the employees, charged with representing their interests fairly and impartially."); In re Beatrice Foods Co., 84 NLRB 512, 514 (1949) (employees cannot be excluded from a bargaining unit simply because those employees are under the jurisdiction of another union); In re Hardy Plastics & Chemical Corp., 76 NLRB 463, 466 n. 10 (1948) (as long as the union provides adequate representation, non-union employees may be included in the bargaining unit represented by such union).
 
 
 55
 We therefore remand this claim for a determination as to whether the Employees, although not union members, nevertheless were included within the collective bargaining units represented by the unions.
 
 
 56
 If the Employees were included within the collective bargaining units, then as a matter of law, we would conclude that the Plan's language is not ambiguous and that Ward could not terminate the Plan with respect to the Employees without providing the requisite notice. If, however, the Employees were not part of the collective bargaining units, because they were all supervisory personnel, for example, then we would agree with the district court that an ambiguity exists in Article XIII's language. It then would be necessary to look to the parties' intent to determine whether Article XIII should be construed to require notice to employees not represented by the unions in addition to requiring notice to the represented employees.
 
 
 57
 The burden rests with the party attempting to enforce its view of the contract to show that its asserted version of the agreement is what the parties intended. Hawaii State Teachers Association v. Hawaii Public Employment Relations Board, 60 Haw. 361, 590 P.2d 993, 997 (1979). At trial, the Employees presented no evidence regarding intent except to argue that their interpretation of the Plan's language was the most reasonable. The Employees argue that because the Plan document does not distinguish between union and non-union participants, then no modification of the Plan through a labor agreement should be interpreted to draw such a distinction either. The Employees do not explain why this conclusion logically follows from Article XIII's language. We discern no reason why Ward and the non-union Employees necessarily would have bound themselves by the results of future labor negotiations in this manner.
 
 
 58
 Ward argues that inclusion of the phrase "with respect to those employees in the respective collective bargaining units" in the labor agreement renders inapplicable to the Employees any Plan modification. Ward presented testimony at trial that neither Ward's negotiators nor the union representatives ever stated or intended that the August 1971 labor agreement apply to non-union plan participants. While these intentions are not dispositive of what the Employees thought that Article XIII meant, this evidence is probative and tends to undermine the reasonableness of the Employees' claimed version of the provision.
 
 
 59
 Because the Employees did not present substantial evidence to the contrary, we would be inclined to hold that the only reasonable conclusion that the trier of fact could have drawn is that Ward's proffered explanation accurately reflects the parties' intent. Nevertheless, for the reasons stated supra, we remand Count XI for further findings by the district court. In addition, if the district court should find that the Employees were included within the collective bargaining units represented by the unions, then dismissal of Count XXIV--which alleges that the Plan continued in existence and is subject to ERISA's requirements because Ward's failed to comply effectively with the termination provisions--would constitute error.
 
 D. Inadequate Funding Issues
 
 60
 In Counts VIII, IX, and XII, the Employees raise interrelated issues concerning Ward's failure to fund adequately the Plan, and to pay promised benefits. Count VIII alleges that Ward breached the Plan's terms by failing to fund fully participants' past service liabilities, while Count IX alleges breach of contract for refusal to pay benefits. As the Employees admitted in their Pretrial Statement, Counts VIII and IX present theories that are "very much the same." Count XII charges that Ward's failure to contribute to the Plan in 1974 violated Article V, which requires Ward to "make[ ] such contributions to the Trust Fund which are necessary to maintain the Plan in full force and effect under the terms of the Internal Revenue Code."
 
 
 61
 The Employees appeal the district court's rulings on jury instructions for Counts VIII and IX, the court's "narrow," restrictive interpretation of the Employees' contract theory, and the grant of summary judgment on Count XII.
 
 1. Counts VIII and IX
 
 62
 The Employees theory below was that Ward's statements in the HONIRONEWS and in the pension brochure constituted an independent, contractual "offer" and that the employees who signed up for the Plan accepted the terms of that offer. The Employees argue that Ward's "offer" contained an implicit promise to pay full pension benefits to vested employees, and that this necessarily imposed a duty on Ward, in the event of Plan termination, to contribute the funds required to meet past service liabilities.
 
 
 63
 In 1978, the district court ruled that the employee brochure and the HONIRONEWS article, in isolation, reasonably could not be construed as a promise either to fund past service liabilities or to accelerate funding of the liabilities upon Plan termination. However, the court concluded that these publications, in conjunction with additional statements that might have been made at the time, would be relevant when interpreting the parties' agreement. Thus, in defining the issue, the court stated that "the remaining inquiry as to Ward is whether circumstances surrounding the use of the newspaper and pamphlet alter the meaning otherwise derived from a plain reading of their representations."
 
 
 64
 The Employees contest the district court's characterization of the issue and its refusal to give plaintiffs' proposed jury instructions.[11] Although their arguments concerning jury instructions are unclear, they appear to contend that the court's instructions unnecessarily restricted and confused the presentation of their contract claims, and "ignored" their theory. Having compared the actual instructions that the court gave with the Employees' proposed instructions, we must disagree that the district court prejudiced the Employees' presentation of their contract theory.[12]
 
 
 65
 In reviewing the adequacy of jury instructions, this court considers the charge as a whole to determine whether it is misleading or incorrectly states the law so as to prejudice the objecting party. Maddox, 792 F.2d at 1412; Coursen v. A.H. Robins, Co., 764 F.2d 1329, 1337 (9th Cir.), modified, 773 F.2d 1049 (9th Cir.1985). The court will not reverse a judgment because of a mistake in the instructions if the instructions fairly and adequately cover the issue presented. Id.
 
 
 66
 Here, the court's instructions did not mislead, and fairly and adequately covered all of the theories that the Employees sought to present. The Employees justifiably sought to place before the jury the issue whether a contract could be created, based on statements made outside the Plan document itself. See Kinoshita v. Canadian Pacific Airlines, Ltd., 724 P.2d 110, 117 (Haw.1986). The court instructed the jury to look at the written pension agreement, but also to examine the newsletter, the pamphlet, and oral statements to determine whether Ward promised to provide full pension benefits in the event of plan termination. This is precisely the theory that the Employees relied upon throughout the trial.
 
 
 67
 Although the court did not use the Employees' proposed language, the court was under no obligation to use any particular language offered by a party. Mitchell v. Keith, 752 F.2d 385, 389 (9th Cir.), cert. denied, --- U.S. ----, 105 S.Ct. 3502, 87 L.Ed.2d 633 (1985). The court's only obligation was to fairly cover the issues. The court did so, and therefore did not err in its characterization of the claims, or in its instructions concerning them.
 
 2. Count XII
 
 68
 The district court held that Ward did not violate Article V of the Plan by failing to make a contribution in 1974. The court concluded that because the Internal Revenue Code did not require contributions at any particular time, no violation of Article V's mandate to make contributions necessary under the Code occurred. Cunha, 545 F.Supp. at 97-98. Moreover, prior to trial, the court held that Ward's failure to contribute did not constitute a diversion of trust funds for purposes other than for the participants' exclusive benefit.[13]
 
 
 69
 On appeal, the Employees do not contest these district court's holdings.[14] Instead, they argue that the pension brochure 's promise to "pay all the costs" of pensions to which the participants are entitled proves that the Plan 's language in Article V is ambiguous.
 
 
 70
 The Employees did not raise this argument before the district court. We decline the Employees' invitation to look to documents outside the Plan now in order to create an ambiguity and a new issue on appeal.
 
 E. Count VII--Failure to Analyze Advice
 
 71
 The Employees contend that the district court erred in granting a directed verdict on their claim that Ward failed to analyze thoroughly Wyatt's advice and act solely in the Plan participants' interests. The Employees' allegations rest on the assumption that, as Plan Administrator and hence, a fiduciary, Ward could take no action that benefitted the company while disadvantaging participants.
 
 
 72
 It is unquestioned that a plan administrator's conduct, like that of a trustee, must be governed by a fiduciary's duty of loyalty. Bogert, The Law of Trusts and Trustees Sec. 543 at 218 (2d ed. 1978). The fiduciary must discharge his obligations solely in the interests of the participants and beneficiaries. Donovan v. Bierwirth, 680 F.2d 263, 271 (2d Cir.), cert. denied, 459 U.S. 1069, 103 S.Ct. 488, 74 L.Ed.2d 631 (1982); Burud v. Acme Electric Co., 591 F.Supp. 238, 246 (D.Alaska 1984). Thus, when a fiduciary's actions that are taken in connection with the performance of his duties as trustee or administrator are in his own interest as well, we rigorously scrutinize the conduct. Bogert, The Law of Trusts and Trustees Sec. 543 Q (2d ed. 1978) (trustee may not obtain incidental benefit for himself while engaged in trust business); Sutton v. Weirton Steel, 724 F.2d 406, 410 (4th Cir.1983) (a post-ERISA case concluding that an administrator could not assume a position where it had "dual loyalties" in the administration of the plan), cert. denied, 467 U.S. 1205 (1984); Bierwirth, 680 F.2d at 271 (corporate officers who are also pension trustees, do not violate fiduciary duties by taking action that incidentally benefits the corporation, provided that they carefully and impartially investigate and conclude that it promotes the beneficiaries' position; "their decisions must be made with an eye single to the interests of the participants and beneficiaries"); Withers v. Teachers Retirement System, 447 F.Supp. 1248, 1256-57 (S.D.N.Y.1978) (although city comptroller's interest conflicted with pension plan's interests, he was not incapable of acting as a trustee, but he had an "especial obligation to act fairly on behalf of those concerned with the results of the action taken") (quoting Westchester Chapter, Civil Service Employees Association v. Levitt, 37 N.Y.2d 519, 521, 375 N.Y.S.2d 294, 295, 337 N.E.2d 748, 749 (1975)) aff'd 595 F.2d 1210 (2d Cir.1979).
 
 
 73
 However, in this case, Ward was not acting in connection with its fiduciary responsibilities as Plan administrator, but instead, was acting in its corporate capacity. The decision to terminate the Plan was a business decision that properly rested with Ward's corporate offices. See Amato v. Western Union Int'l., Inc., 596 F.Supp. 963, 968 (S.D.N.Y.1984) ("an employer that also acts as plan administrator 'wears two hats'. The employer assumes fiduciary status only when and to the extent that it functions in its capacity as plan administrator, and not when it is conducting business not otherwise regulated by ERISA") (emphasis added); aff'd in part, rev'd in part, on other grounds, 773 F.2d 1402 (2d Cir.1985); Dhayer v. Weirton Steel, 571 F.Supp. 316, 328-29 (N.D.W.Va.1983) (court presumed that employer's sole motivation for sale of division was to avoid pension obligations and concluded that although a " 'dual loyalty' inherently exists when the employer (which is naturally interested in keeping its costs for pension benefits at a minimum) also acts as administrator or fiduciary of a pension plan.... [T]he mere fact that a company has named itself as pension plan administrator, fiduciary or trustee does not restrict it from pursuing reasonable business behavior"), aff'd, sub nom. Sutton v. Weirton Steel, 724 F.2d 406 (4th Cir.1983), cert. denied sub nom. Sutton v. Weirton Steel, Brunner v. Nahonal Steel, 467 U.S. 1205, 104 S.Ct. 2387, 81 L.Ed.2d 345 (1984). Because Ward was not acting as an administrator when making the decision to terminate the Plan, its actions, although clearly taken in its own best interests, did not constitute a breach of fiduciary duty.
 
 F. Unfair and Deceptive Acts and Practices
 
 74
 The district court granted Ward a directed verdict on Count XIX, the Employees' claim that Ward's conduct violated Haw.Rev.Stat. Sec. 480-2 (1976), which prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices, in the conduct of any trade or commerce." Haw.Rev.Stat. Sec. 480-13 provides a private right of action for violation of Sec. 480-2.
 
 
 75
 To maintain a cause of action under Sec. 480-13, a private plaintiff must demonstrate: (1) that a violation of chapter 480 [Monopolies; Restraint of Trade] i.e., an "unfair act" has occurred; (2) that an injury to plaintiff's business or property has resulted; (3) proof of damages; and (4) that the action is in the public interest or that the defendant is a merchant. Rosa v. Johnson, 3 Haw.App. 420, 651 P.2d 1228, 1233 (1982); Wiginton v. Pacific Credit Corp., 2 Haw.App. 435, 634 P.2d 111, 118 (1981).
 
 
 76
 In Ailetcher v. Beneficial Finance Co., 2 Haw.App. 301, 632 P.2d 1071, 1076 (1981), the Hawaii court stated that in the absence of a statutory violation, restraint of trade, or monopolization of commerce, a prima facie case still might exist if the public interest requiring protection was sufficiently strong. In Ailetcher, an automobile dealer and one employee sued a finance company because of the finance company's refusal to make loans to the dealer's customers until the employee paid a delinquent loan. The court found no statutory violation, and no action constituting an unfair method of competition, restraint of trade, or a monopolization of commerce. However, the court broadly construed Secs. 480-2 and 480-13, holding that "an unfair act" is committed, and the public interest requirement is met whenever "the unfair method is being employed under circumstances which involved flagrant oppression of the weak by the strong."
 
 
 77
 In a subsequent case, Rosa v. Johnson, 3 Haw.App. 420, 651 P.2d 1228, 1234 (1982), the court of appeals stated that a "practice is unfair when it offends established public policy and when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers." Accord, Eastern Star, Inc. v Union Building Materials, 712 P.2d 1148, 1154 (Haw.App.1985).
 
 
 78
 We are unable to conclude that Ward's negligent misrepresentation, without more, constituted "flagrant oppression," or "immoral, unethical, oppressive, unscrupulous" conduct. Dismissal of this count on a directed verdict was proper.
 
 
 79
 G. Refusal to Permit Amendment of the Complaint and to Give Instructions
 
 
 80
 During trial, the Employees requested that they be allowed to amend their complaint to state a claim for promissory estoppel, and that the court instruct the jury on this issue. The court refused. The decision to grant or deny a request to amend the complaint is within the district court's discretion. International Association of Machinists and Aerospace Workers v. Republic Airlines, 761 F.2d 1386, 1390 (9th Cir.1985).
 
 
 81
 To recover on a claim of promissory estoppel, the plaintiff must prove that the defendant made a promise, upon which the plaintiff detrimentally relied. Ravelo v. County of Hawaii, 66 Haw. 194, 658 P.2d 883, 887 (1983). Recovery is limited to an amount that does not place the promisee in a better position than would performance of the promise. Id. 658 P.2d at 888.
 
 
 82
 However, in the Employees' case, the jury, when considering the contract claims, found that Ward made no promise to pay full pensions. Thus, even if the district court should have allowed the amendment and placed the issue before the jury, such error was more probably than not harmless. See A.H. Robins, 764 F.2d at 1337 (an error in a civil trial need only be found more probably than not harmless).
 
 
 83
 H. District Court Decisions to Admit and Exclude Evidence
 
 
 84
 The Employees contend that the district court should not have permitted Ward's expert witness to testify on matters of liability, because Ward previously had indicated that the expert's testimony would be limited to damages issues. At the pretrial conference, the Employees did learn that he would testify regarding liability. Whether to permit witness testimony is a matter peculiarly within the district court's discretion. Forro Precision, Inc. v. IBM, 673 F.2d 1045, 1058 (9th Cir.1982), cert. denied, --- U.S. ----, 105 S.Ct. 2664, 86 L.Ed.2d 280 (1985). The district court concluded that the Employees received sufficient advance notice of the nature of the testimony. The district court's decision was well within its discretion in this case. See id. (witnesses were permitted to testify even though they were not identified until after the trial commenced).
 
 
 85
 The Employees also argue that the court should not have excluded evidence of an opinion written by the Pension Benefit Guarantee Corporation. This opinion stated that, due to Honiron's liquidation, Ward had good reason to terminate its Plan at some point, but that Ward impermissibly timed the termination for the purpose of securing PBGC insurance without incurring corporate liability.
 
 
 86
 Although the court did not admit the actual opinion, it accurately summarized the opinion's contents for the jury pursuant to a stipulation between the parties.[15] We find no abuse of discretion.
 
 
 87
 The district court's judgment is AFFIRMED in part, and REVERSED and REMANDED in part. Each party shall bear its own costs. This panel retains jurisdiction over any subsequent proceedings in this action.
 
 
 
 [1]
 We note that the Employees' Second Amended Complaint names "Doe" defendants. It is not apparent from the record that these defendants ever were dismissed from the action. However, because the district court could have dismissed such defendants and cured any jurisdictional defect, their presence is not fatal to the action. This court now dismisses them. Othman v. Globe Indemnity Co., 759 F.2d 1458, 1463 (9th Cir.1985)
 
 
 [2]
 Restatement (Second) of Torts
 Sec. 552B. Damages for Negligent Misrepresentation
 (1) The damages recoverable for a negligent misrepresentation are those necessary to compensate the plaintiff for the pecuniary loss to him of which the misrepresentation is a legal cause, including
 (a) the difference between the value of what he has received in the transaction and its purchase price or other value given to it; and
 (b) pecuniary loss suffered otherwise as a consequence of the plaintiff's reliance upon the misrepresentation.
 (2) the damages recoverable for a negligent misrepresentation do not include the benefit of the plaintiff's contract with the defendant.
 (Emphasis added).
 
 
 [3]
 The Restatement recommends providing plaintiffs in fraud cases with the option of recovering the benefit-of-the-bargain damages. The Restatement argues persuasively that different policy considerations apply in cases of deliberate fraud than in cases in which the tortious conduct is merely negligent. See Restatement Secs. 549(2); 552(B) comments (a) and (b)
 
 
 [4]
 We note that the Hawaii courts have found the Restatement persuasive in other areas of tort law as well. See, e.g., Wolsk v. Hawaii, 711 P.2d 1300, 1302 (Haw.1986) (applying the Restatement to determine whether the state is liable for criminal conduct of third parties on state property); Collins v. Greenstein, 61 Haw. 26, 595 P.2d 275, 283-86 & nn. 10-12, 14-15 (Haw.1979) (relying on several Restatement sections); Molokoa Village Development Co. v. Kauai Electric Co., 60 Haw. 582, 593 P.2d 375, 381 & n. 1 (Haw.1979) (adopting the rule in Restatement (Second) of Torts Sec. 551 (1977) to govern liability for nondisclosure by a party to a business transaction). But see Leong v. Takasaki, 55 Haw. 398, 520 P.2d 758, 761-64 (1974) (holding that a plaintiff could recover for negligent infliction of emotional distress unaccompanied by physical injury; court's holding was contrary to the Restatement position, and noted that the trend was toward abandonment of artificial barriers to recovery)
 
 
 [5]
 In one case, Silva v. Bisbee, 2 Haw.App. 188, 628 P.2d 214, 216 (1981), clients sued their real estate broker for fraud. The broker failed to disclose that she had an interest in the joint venture that purchased her client's property. The joint venture purchased the property for a price that was far below market value, although it equalled the client's asking price. The court concluded that a fiduciary relationship existed, and it determined that a jury could find that damages equalled the difference between the true value of the property and the amount that the plaintiffs actually received. The court did not elaborate on the damages theory being invoked. Under either an out-of-pocket theory or pursuant to a constructive trust, plaintiff would be entitled to the amount that the court discussed
 
 
 [6]
 As a result, we do not reach Ward's arguments that no fiduciary duty existed to the employees prior to their joining the Plan, and that even if such a duty existed, it did not encompass explaining the Plan to the participants. Cf. Freeman, 721 F.2d at 656 (ERISA did not protect a prospective plan participant, who never joined the plan because of the defendant employer's misrepresentations)
 
 
 [7]
 Article XIII states in relevant part:
 In the event of termination of the Plan, or upon complete discontinuance of contributions under the Plan, the rights of each Participant under the Plan shall become immediately vested and non-forfeitable. The assets of the Plan then held in the Trust Fund shall be liquidated and distribution shall be made to the extent funds are available in the following order:
 (1) To retired Participants, contingent annuitants, and Participants past their Normal Retirement Dates to the extent of the actuarial reserves computed for their benefits at the date of termination of the Plan.
 (2) To all Participants who have a vested right to a pension, or to any Participants who are eligible to retire under the Plan's early retirement provisions to the extent of the actuarial reserves computed for benefits credited to the date of termination of the Plan as of the date of termination of the Plan.
 * * *
 Assets will be allocated to (1) up to 100% of the liability therein before any allocation to (2), and assets will be allocated to (2) up to 100% of the liability therein before any are allocated to (3)....
 
 
 [8]
 The district court analyzed Count X as alleging a breach of contract. See Cunha, 545 F.Supp. at 96. This was a correct characterization, since the Second Amended Complaint is so phrased. In addition, the Employees' Motion for Partial Summary Judgment before the district court argued that Ward's conduct constituted a breach of the contract's implied covenant of good faith and fair dealing and an attempt to make a de facto amendment to the Plan without fair notice, as required by Ward's agreements with various unions. On appeal, the Employees now couch their argument in terms of Ward's breach of a fiduciary duty, which is a substantially different theory. This court generally will not reverse a district court on a contention that the appellant failed to present below. United States v. Munoz, 746 F.2d 1389, 1390 (9th Cir.1984) (court refused to consider a tort theory on appeal when appellants only presented a contract theory to the district court). However, for the same reasons as discussed supra, we would find no merit in the Employees breach of fiduciary duty argument. See Sutton v. Weirton Steel, 724 F.2d 406, 411 (4th Cir.1983) (ERISA does not require a fiduciary to account for expenditures from its corporate treasury that are made for corporate purposes), cert. denied, 467 U.S. 1205, 104 S.Ct. 2387, 81 L.Ed.2d 345 (1984)
 
 
 [9]
 As supporting authority, Ward cites Karo v. San Diego Symphony Orchestra Assn., 762 F.2d 819, 822 (9th Cir.1985) (when a person is not a member of a collective bargaining unit, and the collective bargaining agreement does not grant expressly benefits to third parties, such persons cannot claim third party beneficiary rights). However, to the extent that the issue here is not whether the employees have third party beneficiary rights, but instead, whether the pension plan agreement incorporated the labor agreement's notice provision by reference, Karo is inapposite
 
 
 [10]
 In their reply brief, the Employees make the confusing statement that this court should ignore this language and focus only upon the actual termination language in paragraph one of the agreement. We cannot follow this suggestion. See Maui Land and Pineapple Co. v. Dillingham Corp., 674 P.2d 390, 395 (Haw.1984) (the court ascertains meaning by looking at the entire context of an agreement, and not at a single word, phrase, or clause in isolation)
 
 
 [11]
 The Employees offered the following set of instructions for both Counts VIII and IX
 Plaintiffs Proposed Jury Instructions
 No. 17 You are instructed that a contract consists of a promise by one party to do a certain thing in the event the other party performs a certain act, and that the performance by the other party of the act constitutes an acceptance of the offer, at which time the contract becomes formed.
 No. 18 You are instructed that in order to constitute a contract between two parties there must be mutual assent by the contracting parties on the essential terms and conditions of the subject about which they are contracting.
 It is not necessary that a contract should be in any precise form of words, and it is sufficient [if] the contracting parties understood and assented to its essential terms and conditions. Assent may be inferred from the acts, conduct and declarations of the parties.
 No. 19 Where several written instruments are executed and delivered at or about the same time, are between the same parties, and concern the same subject, all are to be construed as one and the same contract. In determining the intent of the parties, you may take into consideration the extrinsic evidence showing the previous dealings of the parties with reference to the pension plan, a previous similar contract existing between the parties in relation thereto, and the acts and declarations of the parties in relation thereto.
 No. 20 You are instructed that in determining the exact provisions and conditions of the oral agreements between Plaintiffs and Ward you should consider the situation of the parties, all of the circumstances attending the transactions, their conduct, the discussions between them, and the statements made by them before, during the terms such agreements were in force, and later.
 You must also consider the subject matter, the interpretations put on the agreements by the parties, the reasonableness or unreasonableness of the claims, and all the facts and circumstances shown in the record which throw any light on the precise agreements of the parties and their understanding of them, and determine therefrom the true relationship between the parties.
 No. 21 In determining the meaning of the terms of any contract, you may consider the surrounding circumstances of the parties at the time of the formation of the alleged contract.
 No. 22 In interpreting the terms of a contract, an interpretation which gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect.
 No. 23 In choosing among the reasonable meanings of a term or terms of an agreement or promise, the meaning that is generally preferred is the one which operates against the party who supplies the words or from whom a writing otherwise proceeds.
 No. 24 A contract may be breached by repudiation. Repudiation consists of the indication by words or conduct that a party is not going to render a performance under a contract, if the effect of this failure of performance will be substantially to impair the value of the contract to the other party.
 
 
 [12]
 The court instructed the jury as follows:
 Now, the last question is: Apart from the pension agreement, did any Ward Foods official make a promise to provide full pension benefits to any of the plaintiffs if the plan was terminated before being fully funded?
 Now, it's conceded that there was a contract between the company and those plaintiffs who joined the plan, relating to the pension arrangement. It's also conceded that the plan was terminated, and that none of these plaintiffs have received the pension. They only received the return of the money that they paid into the pension fund. You'll recall that they paid a certain amount, and for a number of years, and then they were not asked to pay any more money; but when the plan was terminated, they got their money back, plus 3 1/2% interest, but they didn't get any part of the pension that they now are suing for.
 Now, the written pension agreement is to be construed along with both the oral and written statements; and to answer Interrogatory 4 "yes," you must find by a preponderance of the evidence that the company promised to provide full pension benefits to the plaintiffs if the pension plan was terminated before being fully funded. Is that clear? That they must prove, the plaintiffs must prove by a preponderance of the evidence, that the company in that newsletter or in that pamphlet or in an oral statement promised to provide plaintiffs with full pension benefits if the pension plan was terminated before being fully funded. (Emphasis added)
 
 
 [13]
 Article V stated that "[a]ll company contributions must be used for the exclusive benefit of participants, retired participants, or their contingent annuitants."
 
 
 [14]
 In their reply brief, the Employees do appear to argue that the district court erred in looking to the provisions of the Internal Revenue Code to aid in its construction of Article V. However, the Employees misapprehend the authority upon which they rely. Barlow v. Marriott Corporation, U.S.Tax Cas. (CCH) 71-2 p 9741 merely holds that the plan qualification provisions in the Internal Revenue Code do not create a private right of action for benefit plan participants; their rights are created by the plan and must be enforced under state law
 
 
 [15]
 The Employees mistakenly argue on appeal that there was no stipulation