T.W. ELECTRICAL SERVICE, INC., Shigeru Shinno dba Fairway Electric, Allied Electric Incorporated, N.N. Electric Company, Inc., Tri-Electric, Inc., Oskins Electric Co., Inc., Wasa Electrical Services, Inc., and Globe Electric, Inc., Plaintiffs-Appellants,

v.

PACIFIC ELECTRICAL CONTRACTORS ASSOCIATION, Defendant-Appellee.

No. 86–1646.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 7, 1986.

Decided Feb. 5, 1987.

Bert T. Kobayashi, Jr., Honolulu, Hawaii, for plaintiffs-appellants.

Robert S. Katz, Honolulu, Hawaii, for defendant-appellee.

Before NELSON, REINHARDT and WIGGINS, Circuit Judges.

NELSON, Circuit Judge:

Eight electrical contractors appeal from the district court's grant of summary judgment in favor of defendant Pacific Electrical Contractors Association on all of the contractors' federal antitrust and related state claims. We affirm.

## I. BACKGROUND

Plaintiff-appellants are eight electrical contractors ("the contractors") that perform electrical construction work in Hawaii and employ electrical construction workers who are members of Local 1186 of the International Brotherhood of Electrical Workers ("IBEW"). Appellee is Pacific Electrical Contractors Association ("PECA"), a trade association that, on behalf of its member electrical contractors, negotiates collective bargaining agreements with Local 1186. PECA also represents electrical contractors who are not members of PECA but who have authorized PECA to represent them in multi-employer bargaining.

PECA's activities are financed by contributions from electrical contractors to a fund ("the Fund") established in a series of four Master Agreements entered into by PECA, signing electrical contractors, and Local 1186 in 1977, 1980, 1983, and 1985. The first two Master Agreements estab-

lished the Pacific Electrical Industry Fund ("PEIF"). The latter two Master Agreements established the Association Service Fee Fund ("ASFF"). All of these agreements provide for the same method of contribution to the Fund: "Each Employer shall contribute" to the Fund an amount equal to a specified percentage of the wages earned by each of the Local 1186 workers whom the electrical contractor employs.

In 1981, several PECA members sought to establish a new trade association and stopped contributing to the PECA Fund. PECA sued these contractors, who included all of the eight plaintiffs in the present suit except Wasa Electrical Services ("Wasa"). As part of a court-approved settlement, in late November and early December 1983, each of the seven contractors—T.W. Electrical Service, Fairway Electric, Allied Electric, N.N. Electric, Tri-Electric, Oskins Electric, and Globe Electric ("Globe")— agreed to turn over their delinquent contributions to the Fund and authorized PECA to be their exclusive negotiator in collective bargaining with Local 1186 until September 30, 1987. Each of these seven settlements also included a stipulation that the contractors agree to dismiss and waive "all claims ... arising out of any action by PECA, its officers, directors or members prior to the date of this Stipulation." Subsequent to these settlements, PECA entered into the 1983 and 1985 Master Agreements with Local 1186, which established the ASFF.

On July 1, 1985, the contractors filed this action. At that time, Wasa and Globe were members of PECA; the six others had authorized PECA to represent them until September 30, 1987 under the November/December 1983 settlements. The complaint alleged that PECA, Local 1186, the national IBEW, and other unidentified co-conspirators conspired between 1977 and the present to require *all* electrical contractors—both PECA members and non-PECA contractors—who use IBEW labor to contribute to the Fund, thus stabilizing the

price of procuring a contract for union electrical construction services and depriving non-PECA contractors of a competitive advantage over PECA members. This conspiracy, the complaint alleged, violated § 1 of the Sherman Antitrust Act, 15 U.S.C. § 1 (1982). The contractors alleged that this conduct also violated Hawaii's antitrust and unfair competition statutes, Haw. Rev.Stat. §§ 480–2, 480–4 (1976). Furthermore, the complaint included a waste-of-assets claim under state law, charging that PECA used the Fund for purposes other than those specified in the Master Agreements.

In December 1985, in a brief opinion, the district court entered summary judgment in favor of PECA on all of the contractors' claims. First, it held that the contractors had not produced any evidence of a conspiracy between PECA, Local 1186, and the national IBEW in violation of federal or state antitrust laws or the state unfair competition statute. It found that the Fund contribution provisions did not require *all* electrical contractors to contribute to the Fund, but only those who are PECA members or who have authorized PECA to negotiate with Local 1186 on their behalf. It also found that all of the contractors fell in these categories and were bound to contribute to the Fund. Second, the district court held that the federal and state antitrust and unfair competition claims "based on the alleged 1977 conspiracy" are barred (1) by the November/December 1983 stipulations and (2) by the statutes of limitations in 15 U.S.C. § 15b (1982) and Haw.Rev.Stat. § 480–24 (1976). Third, it held that there was no evidence that PECA wasted assets of the Fund.

The contractors challenge all of these rulings on appeal.[1] Jurisdiction over this appeal is based on 28 U.S.C. § 1291 (1982).

## II. DISCUSSION

This court reviews a district court's grant of summary judgment de novo. *E.g., 49er Chevrolet, Inc. v. Gener-*

---

1. A final claim, for declaratory relief to interpret PECA's bylaws, also was decided adversely to the contractors. That decision is not challenged on appeal.

*al Motors Corp.*, 803 F.2d 1463, 1466 (9th Cir.1986). The district court's determinations of the law governing federal and state claims are equally subject to de novo review. *In re McLinn*, 739 F.2d 1395, 1403 (9th Cir.1984) (en banc). Therefore, when reviewing a grant of summary judgment, this court sits in the same position as the district court and applies the same summary judgment test that governs the district court's decision.

## A. The Summary Judgment Test

Rule 56 provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." [2] Fed.R. Civ.P. 56(c). A "material" fact is one that is relevant to an element of a claim or defense and whose existence might affect the outcome of the suit. The materiality of a fact is thus determined by the substantive law governing the claim or defense. Disputes over irrelevant ·or unnecessary facts will not preclude a grant of summary judgment. *Anderson v. Liberty Lobby, Inc.*, — U.S. —, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

Whether a "genuine" issue can be said to exist with respect to a material fact is often a close question. Clearly, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, — U.S. —, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Rule 56 provides further guidance. If the party moving for summary judgment meets its initial burden of identifying for the court the portions of the materials on file that it believes demonstrate the absence of any genuine issue of material fact, *see Celotex Corp. v. Catrett*, — U.S. —, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *Adickes v. S.H. Kress*

*& Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1600, 26 L.Ed.2d 142 (1970), the nonmoving party may not rely on the mere allegations in the pleadings in order to preclude summary judgment. *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 289 & n. 19, 88 S.Ct. 1575, 1593 n. 19, 20 L.Ed.2d 569 (1968). Instead, the nonmoving party must set forth, by affidavit or as otherwise provided in Rule 56, *"specific facts* showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e) (emphasis added); *see Kaiser Cement Corp. v. Fischbach & Moore, Inc.*, 793 F.2d 1100, 1103–04 (9th Cir.), *cert. denied*, — U.S. —, 107 S.Ct. 435, 93 L.Ed.2d 384 (1986). Hence the nonmoving party may not merely state that it will discredit the moving party's evidence at trial and proceed in the hope that something can be developed at trial in the way of evidence to support its claim. *See Anderson*, 106 S.Ct. at 2514; *Cities Serv.*, 391 U.S. at 289–90, 88 S.Ct. at 1592–93. Instead, it must produce at least some "significant probative evidence tending to support the complaint." *Id.* at 290, 88 S.Ct. at 1593.

"[T]he issue of material fact required by Rule 56(c) to be present to entitle a party to proceed to trial is not required to be resolved conclusively in favor of the party asserting its existence; rather, all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *Id.* at 288–89, 88 S.Ct. at 1592. Thus, at this stage of the litigation, the judge does not weigh conflicting evidence with respect to a disputed material fact. *Anderson*, 106 S.Ct. at 2513. Nor does the judge make credibility determinations with respect to statements made in affidavits, answers to interrogatories, admissions, or depositions. *See id.* These determinations are within the province of the factfinder at trial. Therefore, at summary judgment, the judge must view the evidence in the light most favorable to the nonmoving par-

---

**2.** Summary judgment must be granted "forthwith," unless the court determines that further time for discovery should be allowed. *See* Fed. R.Civ.P. 56(f).

ty: if direct evidence produced by the moving party conflicts with direct evidence produced by the nonmoving party, the judge must assume the truth of the evidence set forth by the nonmoving party with respect to that fact. Put another way, if a rational trier of fact might resolve the issue in favor of the nonmoving party, summary judgment must be denied. *Matsushita,* 106 S.Ct. at 1356; *Cities Serv.,* 391 U.S. at 289, 88 S.Ct. at 1592.

Inferences must also be drawn in the light most favorable to the nonmoving party. *Anderson,* 106 S.Ct. at 2513; *Matsushita,* 106 S.Ct. at 1356–57. Inferences may be drawn from underlying facts that are not in dispute, such as background or contextual facts, *see id.* at 1356; *Cities Serv.,* 391 U.S. at 285–86, 88 S.Ct. at 1590–91, and from underlying facts on which there is conflicting direct evidence but which the judge must assume may be resolved at trial in favor of the nonmoving party. Assuming the existence of these underlying facts, however, an inference as to another material fact may be drawn in favor of the nonmoving party only if it is "rational" or "reasonable" and otherwise permissible under the governing substantive law. *Anderson,* 106 S.Ct. at 2513; *Matsushita,* 106 S.Ct. at 1356–57; *Barnes*

*v. Arden Mayfair, Inc.,* 759 F.2d 676, 680–81 (9th Cir.1985). Clearly, there must be some limit on the extent of the inferences that may be drawn in the nonmoving party's favor from whatever "specific facts" it sets forth; if not, Rule 56(e)'s requirement of "specific facts" would be entirely gutted.

Thus, the court's ultimate inquiry is to determine whether the "specific facts" set forth by the nonmoving party, coupled with undisputed background or contextual facts, are such that a rational or reasonable jury might return a verdict in its favor based on that evidence. *Anderson,* 106 S.Ct. at 2514 ("[T]he plaintiff, to survive the defendant's motion [for summary judgment], need only present evidence from which a jury might return a verdict in his favor.").[3] If the nonmoving party produces direct evidence of a material fact, the court may not assess the credibility of this evidence nor weigh against it any conflicting evidence presented by the moving party. The nonmoving party's evidence must be taken as true. Inferences from the nonmoving party's "specific facts" as to other material facts, however, may be drawn only if they are reasonable in view of other undisputed background or contextual facts and only if such inferences are

---

**3.** In *Anderson,* the Court held that the judge must also take into account the substantive evidentiary burden that the nonmoving party must meet at trial—*e.g.,* "a preponderance of the evidence" in most civil cases or "clear and convincing evidence" for actual malice in libel cases. *See Anderson,* 106 S.Ct. at 2513 ("[T]he judge must view the evidence presented through the prism of the substantive evidentiary burden."). Although the Court adhered to the longstanding rules that the judge should neither engage in credibility determinations nor weigh the evidence presented by opposing parties and that all evidence and justifiable inferences must be viewed in the light most favorable to the nonmoving party, *see id.,* other passages, if read out of context, might suggest that weighing of the evidence is an appropriate function of the judge at summary judgment. *See id.* at 2512 ("[T]he inquiry ... is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."); *id.* ("The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a

preponderance of the evidence that the plaintiff is entitled to a verdict...."). Given its continued adherence to the standard rules governing summary judgment noted above, we understand these statements to mean that a court must determine whether the evidence presented by the nonmoving party, coupled with undisputed background and contextual facts, *see Matsushita,* 106 S.Ct. at 1356, are such that a jury could reasonably find in its favor in view of the appropriate substantive evidentiary burden. Hence, the inquiry focuses on whether the nonmoving party has come forward with sufficiently "specific" facts from which to draw reasonable inferences about other material facts that are necessary elements of the nonmoving party's claim. Were we to construe the Court's statements as requiring a court to ask whether a jury could find in favor of the nonmoving party viewing *all* of the evidence—both that presented by the nonmoving party and that presented by the moving party—such a construction would contradict the clear instruction that a court may not weigh the evidence or assess its credibility.

otherwise permissible under the governing substantive law. This inquiry ensures that a "genuine" issue of material fact exists for the factfinder to resolve at trial.

A special consideration applies in antitrust cases involving an allegation of conspiracy under § 1 of the Sherman Act: "antitrust law limits the range of permissible inferences from ambiguous evidence." *Matsushita,* 106 S.Ct. at 1357. In particular, evidence of conduct that is "as consistent with permissible competition as with illegal conspiracy does not, *standing alone,* support an inference of antitrust conspiracy." *Monsanto Co. v. Spray-Rite Serv. Corp.,* 465 U.S. 752, 764, 104 S.Ct. 1464, 1470, 79 L.Ed.2d 775 (1984) (emphasis added). In such cases, the Court has required that "[t]o survive a motion for summary judgment ..., a plaintiff seeking damages for a violation of § 1 must present evidence 'that tends to exclude the possibility' that the alleged conspirators acted independently." *Matsushita,* 106 S.Ct. at 1357 (quoting *Monsanto,* 465 U.S. at 764, 104 S.Ct. at 1471).[4]

■ Therefore, a defendant moving for summary judgment in an antitrust case under § 1 has the initial burden of identifying the portions of the materials on file that it believes show an absence of a genuine issue of material fact with respect to the existence of the alleged conspiracy. *See Celotex,* 106 S.Ct. at 2553. Where there is no direct evidence of a conspiracy, the defendant may discharge its summary judgment burden by proffering a "plausible and justifiable" alternative interpretation of its conduct that rebuts the plaintiff's allegation of conspiracy. *See O.S.C. Corp. v. Apple Computer, Inc.,* 792 F.2d 1464, 1467–68 (9th Cir.1986); *Barnes,* 759 F.2d at 680. The plaintiff must then come forward with direct or circumstantial evidence—*i.e.,* "specific facts"—that is capable of sustaining a rational inference of conspiracy and that tends to exclude the possibility that the defendant acted independently of the alleged co-conspirators, and thus lawfully. *See Matsushita,* 106 S.Ct. at 1357; *Monsanto,* 465 U.S. at 764, 104 S.Ct. at 1470; *Barnes,* 759 F.2d at 680.

■ Hence, although the Supreme Court has not abandoned the presumption that summary judgment is disfavored in complex antitrust cases that involve issues of motive and intent, *see Poller v. Columbia Broadcasting Sys.,* 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962), the Court has imposed an additional requirement in certain cases. Where an antitrust plaintiff's allegation of a conspiracy is based solely on indirect evidence that is capable of inferences of both lawful and unlawful behavior, the plaintiff must produce some evidence tending to exclude the possibility that the defendant acted independently. If the plaintiff does not produce such evidence or provide a reason for not doing so under Rule 56(f), a grant of summary judgment in favor of the defendant is appropriate. *See Matsushita,* 106 S.Ct. at 1356–57; *Souza v. Estate of Bishop,* 799 F.2d 1327, 1329–30 (9th Cir.1986); *Ralph C. Wilson Indus., Inc. v. Chronicle Broadcasting Co.,* 794 F.2d 1359, 1362, 1365–66 (9th Cir.1986).

## B. The Federal Antitrust Claim

■ Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States." 15 U.S.C. § 1 (1982). Hence, in order to maintain a successful § 1 action, the contractors must show (1) that there was a contract, combination, or conspiracy, *i.e.,* an agreement or concerted

---

**4.** Such a limitation on permissible inferences from ambiguous evidence alone, the *Monsanto* Court explained, was in part necessary to avoid the erosion of the doctrine enunciated in *United States v. Colgate & Co.,* 250 U.S. 300, 307, 39 S.Ct. 465, 468, 63 L.Ed. 992 (1919), which held that a manufacturer's independent refusal to deal with distributors did not violate antitrust

laws. *See Monsanto,* 465 U.S. at 763, 104 S.Ct. at 1470. To permit an inference of conspiracy from "highly ambiguous evidence" in that case would create an "irrational dislocation in the market" and unfairly expose legitimate business conduct to the possibility of treble damage liability. *See id.* at 763–64, 104 S.Ct. at 1470.

action toward "a common goal," *see Monsanto*, 465 U.S. at 761, 764, 104 S.Ct. at 1469; *49er Chevrolet*, 803 F.2d at 1467, (2) that the agreement "unreasonably" restrains trade, under either a per se rule of illegality or a rule of reason analysis, *see United States v. Topco Assocs.*, 405 U.S. 596, 606–08, 92 S.Ct. 1126, 1133–34, 31 L.Ed.2d 515 (1972); *O.S.C. Corp.*, 792 F.2d at 1467; *see also National Soc'y of Professional Eng'rs v. United States*, 435 U.S. 679, 686–92, 98 S.Ct. 1355, 1362–65, 55 L.Ed.2d 637 (1978), and (3) that the restraint affected interstate commerce.

The contractors summarily assert that, by noting the existence of the Fund provisions in the various Master Agreements, they have established the element of an agreement. They thus argue that the grant of summary judgment was improper because there is a dispute over whether the economic effects of the agreement are such that the agreement "unreasonably" restrains trade. Yet the contractors proceed too quickly. The first step in a § 1 analysis is to determine the identity of the alleged conspirators and the content of the alleged conspiracy. Only then can a court proceed to determine whether the concerted action unreasonably restrains trade. *See 49er Chevrolet*, 803 F.2d at 1467 (stating that plaintiffs must prove that defendants had "a conscious commitment to a common scheme designed to achieve an unlawful objective"); *Mutual Fund Investors, Inc. v. Putnam Management Co.*, 553 F.2d 620, 625 (9th Cir.1977) (stating that an antitrust conspiracy requires "a plurality of actors concerting their efforts towards a common goal"); 6 *P. Areeda, Antitrust Law* ¶ 1409, at 59–60 (1986) ("[I]t is important to specify which possible agreement we are analyzing for legality. Of course, we can and should analyze each in turn."); *see also id.* ¶ 1400, at 4 (distin-

guishing the existence of an agreement from its legality). We therefore turn to the complaint to determine what the content of the alleged conspiracy was.

The contractors' complaint alleges that PECA, Local 1186, the national IBEW, and other unidentified co-conspirators "agreed among themselves to require that *all* electrical contractors in the electrical industry using union electrical workers who are members of and represented by IBEW contribute" to the Fund. The complaint further alleges that "[f]or the purpose of forming and effectuating the aforesaid ... conspiracy," the defendants formulated the Master Agreement and the Fund contribution provision.[5] We assume for purposes of our opinion that the allegations, if true, would set forth a claim under the Sherman Act. Defendants do not raise on appeal the issue whether an exemption from the Act exists because of the relationship of the parties and the subject matter of the agreement. Thus, the only issue before us is whether summary judgment was proper assuming the Sherman Act does apply.

PECA met its burden of informing the district court of the absence of evidence of a conspiracy to require all electrical contractors to contribute to the Fund. Hence, the burden shifts to the contractors to produce "specific facts," by affidavit or as otherwise provided in Rule 56, that would support a reasonable finding that PECA participated in such a conspiracy and thereby reveal the existence of a genuine issue for trial. *See* Fed.R.Civ.P. 56(e). The contractors offer the following evidence that might indicate the existence of such a conspiracy.

First, the contractors contend that the Fund contribution provisions themselves require all contractors in the industry to contribute to the Fund. The plain lan-

---

**5.** We need not address the allegation in the complaint that the national IBEW and Local 1186, "by virtue of the [Master] Agreement, has [sic] combined with a favored group of employers (PECA members) to impose upon another group of employers (non-PECA members)" the Fund contribution provision. The national IBEW and Local 1186, originally named as de-

fendants in this action, have since been dismissed. Individual PECA members are not defendants in this action. Hence, we note that the complaint does not allege a horizontal conspiracy among PECA members, but rather a vertical conspiracy between PECA, Local 1186, the national IBEW, and the as yet unidentified co-conspirators.

guage of these provisions betrays this assertion. The 1977 and 1980 provisions require "[a]ll Employers to participate" in the Fund and "[e]ach Employer" to contribute. The preamble to these Master Agreements defines "Employer" as contractors who are signatories to the agreement. The 1980 agreement further defines "Employer" as any person owning 10% of a business, perhaps giving rise to an ambiguity. But the 1985 agreement dispels any such ambiguity by explicitly defining "Employer" as "a member of PECA, or an individual firm signatory to this Agreement or who signs a letter of assent to be bound by this Agreement."

This case is thus clearly distinguishable from *National Electrical Contractors Association v. National Constructors Association*, 678 F.2d 492 (4th Cir.1982), *cert. dismissed*, 463 U.S. 1233–34, 104 S.Ct. 26, 77 L.Ed.2d 1449 (1983) [hereinafter "*NECA* "], which the contractors urge us to follow. *NECA* upheld a grant of summary judgment to *plaintiffs* in a case in which the union-trade association contract required "[a]ll construction agreements in the electrical industry" to contain a fund contribution provision. *Id.* at 496. Throughout its discussion, the *NECA* court emphasized that the fund contribution provision applied to *all* agreements in the construction industry. *See id.* at 498–99. Thus, the court held that on its face the fund contribution provision, with extensive corroborative background information that supported the clear meaning of the provision, constituted a price-fixing agreement that was subject to the per se rule of illegality.[6] *See id.* at 498–501.

The fact that the present case is distinguishable from *NECA*, however, does not require the conclusion that PECA is entitled to summary judgment. The contractors may still survive the motion for summary judgment if the more limited Fund contribution provision, coupled with other circumstantial evidence, indicates the existence of a broader conspiracy to require all contractors to contribute to the Fund. *See Souza*, 799 F.2d at 1329–30 (noting that a "conspiracy cannot usually be established by direct proof"). Hence, the contractors cite to a letter from Rodney Kim, executive secretary of PECA, to P & C Electrical Service that allegedly shows an effort by PECA to force a non-PECA contractor to include a Fund contribution provision in an apparently independent contract with Local 1186. The text of the letter indicates, however, that this contractor had previously agreed to include the provision and that PECA was merely attempting to prevent the contractor from rescinding it.

■ We further note that, even if this letter were what the contractors claimed it to be, it would show only that PECA sought to compel nonmembers to contribute to the Fund, not that PECA, Local 1186, and the national IBEW conspired to do so. The contractors conceded at oral argument that there was no evidence on the record that would indicate complicity by Local 1186 or the national IBEW in such action by PECA. Indeed, the record contains only contrary evidence: two letters from Local 1186's business manager to PECA and all contractors covered by the Master Agreement, dated July 1985, report that the local had entered into two labor agreements that did not include the Fund contribution provision and that, under the "favored nations" clause in the Master Agreement, the covered contractors were entitled to a similar exclusion. These letters contradict the contractors' mere allegation of a conspiracy involving Local 1186. Independent action does not fall within the ambit of § 1 of the Sherman Act. *Fisher v. City of Berkeley*, 106 S.Ct. 1045, 1049 (1986); *49er Chevrolet*, 803 F.2d at 1466–67. The contractors have not alleged a violation of § 2 of the Sherman Act, which encompasses unilateral action.

Hence we are also unable to draw a reasonable inference from the evidence on the record, as the contractors suggest, that the insertion of the "favored nations"

---

**6.** We note that, because the facts and issues in the case before us are different from those in *NECA*, we express no view as to whether we would follow the Fourth Circuit's opinion.

clause into the Master Agreements reflects such a conspiracy between PECA, Local 1186, and the national IBEW. The contractors assert that the clause was added to induce Local 1186 to include the Fund contribution provision in agreements that Local 1186 may negotiate independently with non-PECA contractors. Even if the insertion of the clause reflects such an intent by PECA, the undisputed evidence on the record discussed above does not provide any basis for a reasonable inference that Local 1186 or the national IBEW participated in such a conspiracy. As noted above, evidence of unilateral action alone is insufficient to sustain a § 1 action.

Finally, PECA has advanced probative evidence supporting an alternative interpretation of its conduct that rebuts the allegation of conspiracy. Affidavits of Rodney Kim state that PECA imposed the Fund contribution on its members and contractors who assented to its representation in collective bargaining in order to recoup the costs of its negotiating and administrative services and spread the costs in proportion to the benefit received by the contractors it represents. Thus, the contractors must not only come forward with "specific facts" showing the existence of a genuine issue of material fact, but also must set forth "specific facts" that tend to *exclude* the possibility that PECA acted independently. *Matsushita,* 106 S.Ct. at 1357; *Monsanto,* 465 U.S. at 764, 104 S.Ct. at 1470; *O.S.C. Corp.,* 792 F.2d at 1467–68; *Barnes,* 759 F.2d at 680. Taken together, the evidence set forth by the contractors to show that PECA participated in a conspiracy to require all contractors to contribute to the Fund simply does not meet this standard. Accordingly, the grant of summary judgment in favor of PECA on this claim was proper.[7]

■ The contractors are thus left with the argument that PECA, Local 1186, and the national IBEW conspired to impose

Fund contributions on PECA members, contractors who authorize PECA to represent them, and contractors who assent to PECA's agreements. Such an agreement clearly exists. As noted above, however, the complaint did not charge that such an agreement, by itself, constituted an antitrust violation. Moreover, the contractors have not produced evidence of injury to competition in the marketplace caused by such an agreement other than the assertion of injury by (and to) one of the contractors. But "injury to the antitrust plaintiff alone is not sufficient to prove injury to competition." *Robert's Waikiki U–Drive, Inc. v. Budget Rent-A-Car Sys.,* 732 F.2d 1403, 1408 (9th Cir.1984). In the absence of evidence of injury to competition, such a claim by the contractors would not survive a motion for summary judgment. *See O.S.C. Corp.,* 792 F.2d at 1469; *Kaiser Cement,* 793 F.2d at 1104–05. Because we affirm the grant of summary judgment to PECA on the federal antitrust claim on the ground that the contractors have produced insufficient evidence of a conspiracy, we do not reach the question concerning the extent to which multi-employer bargaining representatives and labor unions may agree to impose fund contributions on contractors who are not full-fledged members of the bargaining unit. *Cf. Abood v. Detroit Bd. of Educ.,* 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977) (upholding union's imposition of service fee equal to union dues on nonunion government employees who by statute were represented by union).

## C. The State Antitrust Claim

The contractors also allege that the conduct of PECA, Local 1186, and the national IBEW violated Haw.Rev.Stat. § 480–4 (1976). Section 480–4(a) is patterned on § 1 of the Sherman Act and provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce in the State,

---

7. Counsel for the contractors stated at oral argument that, although he believed that evidence of a conspiracy might have been uncovered if more extensive discovery had taken place, the

decision below is not challenged on the ground that the district court had afforded inadequate time for discovery.

or in any section of this State is illegal." Courts applying Hawaii's antitrust laws have long interpreted them consistently with analogous federal statutes, *see Bartleys Town & Country Shops, Inc. v. Dillingham Corp.*, 530 F.Supp. 499, 513 (D.Haw.1982); *Island Tobacco Co. v. R.J. Reynolds Indus., Inc.*, 513 F.Supp. 726, 738 & n. 20 (D.Haw.1981); *Island Tobacco Co. v. R.J. Reynolds Tobacco Co.*, 63 Haw. 289, 297–99, 627 P.2d 260, 266–68 (1981), and in 1981 the Hawaii legislature explicitly provided that § 480–4, among other provisions, "shall be construed in accordance with judicial interpretations of similar federal antitrust statutes," *see* Haw.Rev.Stat. § 480–3 (Supp.1984). Therefore, because we find that the contractors did not produce sufficient evidence to withstand summary judgment on the claim under § 1 of the Sherman Act, we also hold that summary judgment was appropriate on the claim under § 480–4.

### D.  The State Unfair Competition Claim

■ The contractors allege that, even if the conduct of PECA does not violate federal or state antitrust laws, such conduct may still violate Hawaii's unfair competition law, Haw.Rev.Stat. § 480–2 (1976). *See Robert's Waikiki U–Drive, Inc. v. Budget Rent-A-Car Sys.*, 491 F.Supp. 1199, 1226 (D.Haw.1980) (holding that the inability to establish an antitrust claim does not preclude a claim under § 480–2), *aff'd*, 732 F.2d 1403 (9th Cir.1984). This section is based on § 5(a)(1) of the Federal Trade Commission Act, 15 U.S.C. § 45(a)(1) (1982), and prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Haw.Rev.Stat. § 480–2 (1976). Like the related state antitrust provisions, § 480–2 is construed in accordance with analogous federal statutes. *See Island Tobacco*, 63 Haw. at 300, 627 P.2d at 268–69; Haw.Rev.Stat. § 480–3 (Supp.1984).

Section 480–13 provides a private right of action for violations of § 480–2. To maintain a cause of action under § 480–13 for a violation of § 480–2, a private plaintiff must demonstrate (1) that an "unfair act" has occurred, (2) that an injury to plaintiff's business or property has resulted, (3) proof of damages, and (4) that the action is in the public interest or that the defendant is a merchant. *Cunha v. Ward Foods, Inc.*, 804 F.2d 1418, 1433 (9th Cir.1986); *Rosa v. Johnston*, 3 Haw.App. 420, 424–25, 651 P.2d 1228, 1233 (1982); *Wiginton v. Pacific Credit Corp.*, 2 Haw.App. 435, 443, 634 P.2d 111, 118 (1981). Under Hawaii law, " 'an unfair act' is committed, and the public interest requirement is met, whenever 'the unfair method is being employed under circumstances which involved flagrant oppression of the weak by the strong.' " *Cunha*, 804 F.2d at 1433 (quoting *Ailetcher v. Beneficial Fin. Co.*, 2 Haw.App. 301, 306–07, 632 P.2d 1071, 1076 (1981)). In addition, a trade practice is "unfair" under § 480–2 if it " 'offends established public policy' " or if it is " 'immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.' " *Eastern Star, Inc. v. Union Bldg. Materials Corp.*, 712 P.2d 1148, 1154 (Haw.App.1985) (quoting *Rosa v. Johnston*, 3 Haw.App. at 427, 651 P.2d at 1234); *see also Robert's Waikiki U–Drive*, 491 F.Supp. at 1226–27 (drawing on similar standards underlying § 5 of the Federal Trade Commission Act in applying § 480–2).

The contractors provide no authority to support their contention that PECA's conduct runs afoul of § 480–2. Indeed, it is difficult to see how the contractors can make out a claim that PECA has used "[u]nfair methods of competition" or "unfair or deceptive acts or practices." First, PECA, a trade association, does not compete with the contractors. Second, Wasa and Globe were members of PECA at the time the suit was filed and have not alleged that their membership was forced upon them. They receive the benefits of PECA's collective bargaining and make contributions to the Fund as do other PECA members. The Master Agreements (and caselaw) set out their options for withdrawal from the multi-employer bargaining unit. *See Charles D. Bonanno Linen Serv. v. NLRB*, 454 U.S. 404, 102 S.Ct. 720, 70

L.Ed.2d 656 (1982). Third, the assignment of the remaining six contractors' collective bargaining rights to PECA until September 30, 1987, pursuant to court-approved settlements in November/December 1983, cannot be said to constitute an unfair or deceptive practice. *Cf. Island Tobacco,* 513 F.Supp. at 736 (holding that the continuation of an unlawful pricing program in contravention of a court order is an unfair method of competition under § 480–2).

The best argument that these six contractors make is that, although their bargaining rights were fairly assigned to PECA, PECA unfairly represented their interests in collective bargaining—either by imposing a Fund contribution provision on them at all or by imposing fees that are disproportionate to the share of the costs of PECA's bargaining activities that could fairly be assessed against each beneficiary of PECA's activities. First, we perceive no unfairness in imposing some fee on non-PECA contractors who authorize PECA to represent them to cover a share of the negotiation and administrative costs of collective bargaining. As to the second argument, the contractors have not offered any evidence, by affidavit or otherwise, that the actual fee imposed on them is disproportionate to a fair share of PECA's actual operating costs. Therefore, we find that the contractors have not produced sufficient evidence to withstand summary judgment on the § 480–2 claim.

### E. The Waste-of-Assets Claim

Sections 6.32 and 6.36 of the 1985 Master Agreement state that the purpose of the Fund is "to provide consideration for the services rendered by the PECA in the administration of this Agreement, and in promoting the construction industry in Hawaii," and that PECA must administer the Fund for these purposes, "including but not limited to the payment of administrative expenses and professional services." The 1977 and 1980 Master Agreements included similar statements of the Fund's purposes and also provided that "[n]o part of the Industry Fund shall be used for *purely* social activities or for any purpose ... in conflict with the interest of the [IBEW] and its Local Unions" (emphasis added). All of the agreements contemplate "legal action ... necessary to enforce payment of contributions."

PECA satisfied its burden of showing the absence of a genuine issue of material fact with respect to the waste-of-assets claim. The Kim affidavit states on personal knowledge (1) that the only social event using Fund assets is a New Year's party to which all Fund contributors were invited, (2) that PECA and non-PECA contractors alike must pay the same fee to attend PECA seminars, (3) that PECA does not pay members' dues to the National Electrical Contractors Association ("NECA"), except for an initial $50 fee paid on behalf of some contractors in 1981, and (4) that conventions paid for with Fund monies were open to all NECA members and were consistent with PECA's purpose of promoting the electrical construction industry, and (5) that PECA had not refused to invite plaintiffs to social or educational functions that were sponsored by PECA or funded with Fund monies. He supplied documentation to support his affidavit.

To avoid summary judgment on this claim, the contractors must set forth "specific facts" that show the existence of a genuine issue of material fact. *See* Fed.R. Civ.P. 56(e). In an affidavit by William Hirose, president of Tri-Electric, the contractors offer general allegations of improper use of assets. The only specific allegations that Hirose does make—those of PECA's use of Fund monies to hold a February 1985 social event for PECA members and to conduct litigation on behalf of PECA in 1984, which PECA admits—are not beyond the broad scope of the Fund's stated purposes. Therefore, the contractors have not produced specific facts that would show the existence of a genuine issue of material fact for trial.

### F. Statutes of Limitations and the Effect of the November/December 1983 Stipulations

Because we hold that the contractors have not produced sufficient evidence to

withstand summary judgment on any of the federal or state claims, we need not examine the extent to which the applicable federal and state statutes of limitations, 15 U.S.C. § 15b (1982) and Haw.Rev.Stat. § 480–24 (1976), or the November/December 1983 stipulations signed by seven of the contractors, would bar claims arising from PECA's various actions during the period 1977 to the present. *See, e.g., La-Salvia v. United Dairymen*, 804 F.2d 1113 (9th Cir.1986); *Hennegan v. Pacifico Creative Serv.*, 787 F.2d 1299 (9th Cir.), *cert. denied*, — U.S. —, 107 S.Ct. 279, 93 L.Ed.2d 254 (1986).

### III. ATTORNEYS' FEES

■ PECA requests that we award it attorneys' fees for this appeal under 28 U.S.C. § 1927 (1982). Section 1927 provides that an attorney who "so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy *personally* the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." *Id.* (emphasis added). This section is "concerned only with limiting the abuse of court processes" and is "indifferent to the equities of a dispute and to the values advanced by the substantive law." *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 762, 100 S.Ct. 2455, 2462, 65 L.Ed.2d 488 (1980). Although abuses of court process under § 1927 usually occur at the trial court level by means of delaying tactics, *see United States v. Associated Convalescent Enters.*, 766 F.2d 1342, 1346–47 (9th Cir.1985); *Lone Ranger Television, Inc. v. Program Radio Corp.*, 740 F.2d 718, 726–27 (9th Cir.1984), courts of appeals may also impose such sanctions, *see McConnell v. Critchlow*, 661 F.2d 116, 118–19 (9th Cir.1981); *Limerick v. Greenwald*, 749 F.2d 97, 101–02 (1st Cir.1984); *United States v. Potamkin Cadillac Corp.*, 697 F.2d 491, 494–95 (2d Cir.), *cert. denied*, 462 U.S. 1144, 103 S.Ct. 3128, 77 L.Ed.2d 1379 (1983); 10 *C. Wright, A. Miller & M. Kane, Federal Practice and Procedure* § 2670, at 219–20 (1983).

■ The law of this circuit requires that imposition of costs and fees under § 1927 may be made only on a finding that the attorney acted " 'recklessly or in bad faith.' " *Associated Convalescent Enters.*, 766 F.2d at 1346 (quoting *United States v. Blodgett*, 709 F.2d 608, 610 (9th Cir.1983), and *Barnd v. City of Tacoma*, 664 F.2d 1339, 1343 (9th Cir.1982)). Notice and a hearing should precede imposition of a sanction under § 1927. *See Blodgett*, 709 F.2d at 610. However, the "mere fact that an appeal is frivolous does not of itself establish bad faith." *Id.* Hence, the "bad faith" factor in part distinguishes § 1927 from other sanction provisions, such as Fed.R.App.P. 38 and 28 U.S.C. § 1912 (1982), which permit imposition of damages and costs on parties for frivolous appeals, *see Associated Convalescent Enters.*, 766 F.2d at 1348; *DeWitt v. Western Pac. R.R.*, 719 F.2d 1448, 1451 (9th Cir.1983). *See Blodgett*, 709 F.2d at 610.

■ In the present case, although we believe that the substance of the contractors' appeal is nonmeritorious, we do not perceive any indication of bad faith in bringing the appeal or of an attempt to delay this court's proceedings in order to obtain a tactical or other advantage. We therefore decline to award attorneys' fees to PECA under § 1927. *See Boksa v. Keystone Chevrolet Co.*, 553 F.Supp. 958, 962 (N.D.Ill.1982) (declining to impose fees under § 1927 in a case in which the plaintiff's position was weak but raised a minimal question of contractual and legal interpretation).

### CONCLUSION

The contractors have not produced sufficient evidence to withstand the motion for summary judgment on the federal antitrust and related state claims. Accordingly, we affirm the district court's grant of summary judgment in favor of PECA.

AFFIRMED.