John DOE, Jane Doe, Individually, and as Prochein Ami for Jane Doe 2, a minor, John Doe 2 and John Doe 3, Plaintiffs,

v.

UNITED STATES of America and Doe Defendants 1–10, Defendants.

Civ. No. 91–00339 DAE.

United States District Court, D. Hawaii.

Nov. 18, 1992.

---

Paul F. Cronin, Patrick F. McTernan, Cronin Fried Sekiya Kekina & Fairbanks, Honolulu, Hawaii, for plaintiff.

Daniel Bent, Michael Chun, Asst. U.S. Attys. Office, Honolulu, Hawaii, Stuart M. Gerson, Asst. Atty. Gen., Torts Branch, Civ. Div., U.S. Dept of Justice, New York City, Jeffrey Axelrad, Roger D. Einerson, Nikki Calvano, U.S. Dept. of Justice, Washington, D.C., for defendants.

1. The factual background of this case spans almost eight years. For reference, the court has

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S PARTIAL MOTION TO DISMISS

DAVID ALAN EZRA, District Judge.

This court heard defendant United States' motion on October 26, 1992. Patrick F. McTernan, Esq. appeared on behalf of the plaintiffs; Nikki Calvano, Esq. appeared on behalf of the United States. After reviewing the motions and the supporting and opposing memoranda, the court grants in part and denies in part the motion for summary judgment and grants the partial motion to dismiss.

## BACKGROUND [1]

In March 1985, John Doe was a patient at the William Beaumont Army Medical Center ("WBAMC") being treated for chronic osteomyelitis. During his hospitalization, John Doe received numerous blood transfusions. In all, his donations consisted of blood from 22 different donors. None of the blood was tested for the presence of Human Immunodeficiency Virus ("HIV").

John Doe tested positive for HIV in October 1988. John Doe's wife, Jane Doe, allegedly contracted HIV from her husband. On July 12, 1991, plaintiffs commenced this action. John Doe and Jane Doe filed suit individually, as did their two adult sons, John Doe 2 and John Doe 3, each alleging that the March 1985 transfusions caused John Doe's HIV positivity. Jane Doe also filed suit as next friend of her minor daughter, Jane Doe 2. The plaintiff children seek damages for loss of consortium and services as well as for emotional distress.

The United States has moved to dismiss or, in the alternative, for summary judgment on the children's claims for emotional distress. It contends the children have

attached a chronology of events as Addendum A.

failed to state a claim under Texas law.[2] The United States also moves for summary judgment against all plaintiffs on the issue of causation. It argues that the plaintiffs have failed to produce any evidence that John Doe obtained HIV through blood he received by the transfusions. Specifically, the United States argues: (1) it is uncontroverted that 21 of the 22 donors are HIV negative and, thus, could not have donated HIV-infected blood; (2) the 22nd donor (Donor 30443) was HIV negative when he donated blood in November 1984, and was still negative in June 1985, which was three months after the blood was transfused into John Doe; (3) John Doe tested HIV negative on October 7, 1987, establishing he did not become infected from the March 1985 transfusion.

## STANDARD OF REVIEW

The United States has moved for summary judgment and to dismiss. Summary judgment shall be entered when:

> [T]he pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.

Fed.R.Civ. P. 56(c). The moving party has the initial burden of demonstrating for the court that there is no genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986) (*citing Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)).

Once the movant has met that burden, the opposing party has the affirmative burden of coming forward with specific facts evidencing a need for trial. Fed.R.Civ. P. 56(e). The opposing party cannot stand on its pleadings, nor simply assert that it will be able to discredit the movant's evidence at trial. *See T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir.1987); Fed.R.Civ. P. 56(e).

There is no genuine issue of fact if the opposing party fails to offer evidence sufficient to establish the existence of an element essential to that party's case and upon which that party will bear the burden of proof at trial. *Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552. The moving party need not support its motion with evidence negating the opponent's claim. *Id.* at 323, 106 S.Ct. at 2553. There is also no issue of fact "where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (citation omitted). Further, pursuant to Local Rule 220–6 it is incumbent upon the parties to cite the portions of the record that they believe establish genuine issues of material fact.

A motion to dismiss will be granted where the plaintiff fails to state a claim upon which relief can be granted. Fed. R.Civ. P. 12(b)(6). A complaint should not be dismissed unless it appears to a certainty that plaintiff "would be entitled to no relief under any set of facts that could be proved." *Fidelity Fin. Corp. v. Federal Home Loan Bank,* 792 F.2d 1432, 1435 (9th Cir.1986), *cert. denied,* 479 U.S. 1064, 107 S.Ct. 949, 93 L.Ed.2d 998 (1987); *Stender v. Lucky Stores, Inc.,* 766 F.Supp. 830, 831 (N.D.Cal.1991). All allegations of material fact are taken as true and construed in the light most favorable to the plaintiff. *Stender,* 766 F.Supp. at 831.

## DISCUSSION

### I. CAUSATION ISSUE

The United States argues that plaintiffs cannot prove any of the donors of the blood product transfused into John Doe had HIV when they donated their blood. The record shows, the United States contends, that none of the blood John Doe received was infected with HIV. If none of the trans-

---

**2.** Plaintiffs' claims are brought under the Federal Tort Claims Act, 28 U.S.C. § 2674. Courts are to apply "the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b); *Carlson v. Green,* 446 U.S. 14, 23, 100 S.Ct. 1468,

1474, 64 L.Ed.2d 15 (1980). Because plaintiffs allege the negligence occurred in Texas, the United States' liability is determined by Texas law.

fused blood was tainted, the transfusions could not have caused John Doe's HIV infection, and summary judgment would be proper.

## A. *The HIV Negative Donors*

The United States contends that 21 of the 22 donors from whom John Doe received blood are HIV negative and, therefore, could not have donated contaminated blood. To support this claim, it has submitted records of the 21 donors showing negative test results at various times after John Doe's transfusions. Twelve donors' results are reported in computer records from the HIV databases of the Army and Air Force;[3] eight donors have individual test results;[4] and one donor orally reported to plaintiffs' attorney, Paul Cronin, that he was HIV negative. Plaintiffs' attorney accepted as accurate the report of the last individual in a hearing in front of Magistrate Judge Conklin.[5]

Plaintiffs contest the validity only of the Army and Air Force HIV database records. They argue that the computer records violate the best evidence rule, are hearsay, and are unreliable. The United States asks this court to make a finding that the database records not only are admissible as evidence of these 12 donors' HIV negativity, but also are presumptively valid.

■ A best evidence objection is not appropriate in this context. The best evidence rule applies where a party attempts to introduce evidence to prove what the contents of a document are, and is more properly thought of as an original document rule. Fed.R.Evid. 1002. The rule does not require the most probative evidence. Here, the United States has not sought to prove the contents of any *document* not in evidence. It is not seeking to prove that the 12 transmittal forms said the HIV results were negative. Rather, the United States seeks to prove what the 12 test results actually were.

■ That is not to say, however, that a hearsay objection is inappropriate. Hearsay is an out-of-court statement offered to prove the truth of the matter asserted. Fed.R.Evid. 801. Here, the United States is introducing the HIV database records as proof that the independent laboratories conducting the tests said the HIV tests were negative. Although hearsay, these records are nevertheless admissible under the business records exception to the hearsay rule. Fed.R.Evid. 803(6). Where it is the regular practice of an organization to create reports or data compilations from information transmitted by a person with personal knowledge, those records are admissible. *Id.*, advisory committee's note. A sufficient foundation for the introduction of such evidence is laid if the person furnishing the information was acting routinely, under a duty of accuracy. *Id.* The court finds that the United States has laid the proper foundation for the HIV computer database records to be admissible pursuant to Federal Rule of Evidence 803(6) as a hearsay exception.

The United States submitted a declaration of John Brundage, M.D., who is the Chief, Department of Epidemiology, Division of Preventive Medicine, Walter Reed Army Institute of Research ("WRAIR"), and who is responsible for the database containing HIV test results for soldiers who have been tested during their military career. The declaration indicates that the blood is drawn and sent to a laboratory with a transmittal form containing the patient's identifying information. After the lab tests the blood, it enters the result onto the transmittal form and into a computer database. The WRAIR Division of Retrovirology conducts inspections of the laboratory every three months to ensure the accuracy of their testing and recording procedures. The laboratory then produces a magnetic tape from their database, which is sent to WRAIR along with the transmittal form. The magnetic tape is electroni-

---

3. Def.'s Ex. 15; Moran Decl.

4. Def.'s Exs. 16–20C. Exhibits 20B and 20C were filed immediately after the hearing, on October 26, 1992.

5. Calvano Decl. ¶ 10 [Def.'s Ex. 21].

cally copied directly into the WRAIR database, from which the printout is made. Brundage Decl. [Def.'s Ex. 27]. Because WRAIR has already conducted over ten million tests, it generally does not keep the magnetic tapes or the transmittal forms. Brundage Supplemental Aff. [Def.'s Ex. 27(1)].[6]

The government also submitted a declaration of Patricia A. Cruse, Technical Supervisor for the U.S. Air Force HIV Testing Services. Cruse Decl. [Def.'s Ex. 27]. The testing procedures for Air Force personnel are nearly identical to those used by the Army. The blood is drawn, sent to a lab, and tested. The laboratory enters the patient's personal information and test result into a computer database. A magnetic tape is produced from the laboratory database and sent to Testing Services, where it is electronically copied into the Air Force database. *Id.*

Based on these declarations, it is clear the laboratories conducting the HIV tests routinely record test results and, knowing the information will be relied on by various government agencies, do so under a duty of accuracy. Additionally, it is the regular practice of WRAIR and Testing Services to record the information supplied by the laboratories in their own databases for use in providing patients with their HIV status, conducting epidemiological research of HIV, and researching a possible vaccine to HIV. *See* Brundage Aff. ¶ f [Def.'s Ex. 27]. Accordingly, the court finds the computer records offered by the United States are reliable and come within the business records exception to the hearsay rule. The records are thus admissible as evidence that 12 of the blood donors whose blood John Doe received are HIV negative.

Although there is no basis upon which the court may find the records presumptively valid, the United States has submitted uncontroverted evidence that 21 of the donors are HIV negative. Consequently, there is no genuine dispute that transfusion of blood from these donors could not

have infected John Doe with HIV. Plaintiffs have not provided a scintilla of evidence to show that any of the 21 donors were, in fact, HIV positive when they donated the blood transfused into John Doe. At the hearing, the plaintiffs argued that negative test results are not necessarily accurate, but provided no evidence to that effect. A naked attack on the evidence is insufficient to create a genuine dispute over whether the 21 donors were HIV positive or negative when they donated the blood. Plaintiffs are required to set forth specific facts showing one of these donors may have caused John Doe's HIV positivity. They cannot rely on conjecture and speculation to satisfy their burden of production. Nor can they simply attempt to discredit the United States' evidence. *T.W. Elec. Serv. Inc. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir.1987); Fed.R.Civ.P. 56(e). "The very mission of the summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Fed.R.Civ.P. 56 advisory committee's notes to 1963 amendment. Plaintiffs have not shown this court that they will ever be able to prove one of these 21 donors was HIV positive. Accordingly, the court grants the United States summary judgment on this issue. The only genuine issue of fact remaining as to causation is whether John Doe could have been infected with HIV by Donor 30443.

### B. *Donor 30443*

It is undisputed that Donor 30443 donated blood in November 1984, and that some portion of that donation was transfused to John Doe in March 1985. It is also uncontroverted that Donor 30443 is now HIV positive. The United States contends, however, that Donor 30443 was not HIV positive when he donated the blood, and therefore his blood could not have caused John Doe's HIV infection.

The United States offers two arguments in support of this claim. First, the United

---

**6.** At the request of the court, this supplemental affidavit was filed after the hearing on November 3, 1992.

States argues that L.B.,[7] who received a transfusion from the same donation as John Doe, is HIV negative. Were the sample from which Doe received blood tainted, the court is told, both L.B. *and* John Doe would be infected. Second, the United States argues that Donor 30443 was HIV negative seven months after he donated the blood. Consequently, he had to have been HIV negative at the time he donated the blood and could not have donated contaminated blood.

### 1. *L.B.'s HIV status*

Unit 30443 was divided into two products: packed red blood cells and fresh frozen plasma. John Doe received the fresh frozen plasma; L.B. received the packed red blood cells.[8] L.B. tested negative for HIV on April 18, 1992. Def.'s Ex. 8. According to the United States, if Unit 30443 was infected with HIV, both L.B. and John Doe would now be HIV positive.

■ The United States has not produced any evidence concerning the transmission rate of HIV through blood transfusions. Unless the transmission rate is 100%, the evidence that L.B. is HIV negative does not conclusively establish that Donor 30443 was HIV negative when he gave the blood. On the other hand, if the transmission rate is greater than 50%, then it is more likely than not that L.B. would be HIV positive if he received infected blood from Donor 30443. Plaintiffs' expert, Elizabeth Donegan, M.D., Associate Professor of Clinical Laboratory Medicine, Pathology, Microbiology and Immunology at the University of California, San Francisco, states in her affidavit that "receipt of an HIV infected blood transfusion carries an approximately 90% risk of recipient infection." Donegan Aff. ¶ 12. It is thus certainly more likely than not that if Unit 30443 were infected, L.B. would be HIV positive. At this stage of the proceeding, however, the United States has failed to show an absence of genuine dispute over this material fact.

■ Furthermore, plaintiffs contend that L.B.'s negative test result is not probative of whether Unit 30443 was HIV infected. According to Dr. Donegan, studies indicate that during prolonged refrigeration (greater than 21 days), the HIV virus begins to die. Donegan Aff. ¶ 9. L.B. received his transfusion of refrigerated red blood cells 21 days after it was donated by Donor 30443. Plaintiffs thus contend that the fact that L.B. tested negative does not mean that Donor 30443 was HIV negative, because the HIV in the refrigerated blood L.B. received may have died before his transfusion. Conversely, freezing HIV infected blood preserves the virus and leads to infection of plasma recipients. *Id.* Therefore, any HIV virus in the frozen plasma John Doe received would have survived. Plaintiffs further argue that L.B. may, in fact, be HIV positive. The ELISA HIV test, which was used to test L.B., does not detect the actual virus but, rather, detects a specific antibody present in an HIV positive individual. *Id.* According to Dr. Donegan, L.B. suffers from a disease that may have damaged his immune system's capability to produce the antibodies to which the ELISA HIV test reacts. *Id.* Consequently, she asserts, L.B.'s negative test result is not probative of Donor 30443's HIV status.

Although Dr. Donegan's affidavit does not contain any of the information on which she relied in formulating her opinions (*see United States v. Various Slot Machs.*, 658 F.2d 697, 699–701 (9th Cir. 1981) (in summary judgment motion, expert must back up his or her opinion with specific facts)), it does contain sufficient evidence to raise a triable issue of fact. The court therefore finds there is a genuine dispute of material fact concerning whether L.B.'s negative test makes it more likely than not that Donor 30443 was negative.

### 2. *Donor 30443's Negative Test*

■ On June 17, 1985, Donor 30443 made a second donation of blood at

---

**7.** In order to protect the privacy of this individual, the court has chosen to use only his initials.

**8.** Plaintiffs dispute whether L.B. received the red blood cells. They give *no* evidence, however, to contradict the government's medical records and affidavit showing he *did* get the blood. *See* Def.'s Ex. 7; Gonzalez Dep. Tr. [Def.'s Ex. 6] at 43:13–23.

WBAMC that tested HIV negative. Def.'s Ex. 10, 11. Donor 30443 gave additional blood in August 1985. At this time his blood showed Hepatitis B and was discarded. Def.'s Ex. 12. Although the United States contends Donor 30443 did not test positive for HIV until March 1986, a WBAMC record shows an entry for HIV positivity as early as August 1985. Construing the evidence in the light most favorable to the nonmoving party as it must, the court will presume Donor 30443 was HIV positive as of August 1985.

The United States argues that Donor 30443's negative test result in June 1985 conclusively proves he was not HIV positive in November 1984, when he donated the blood received by John Doe. Plaintiffs argue that the June 1985 test was not performed properly, and the result is therefore unreliable and inadmissible.

To prove the invalidity of the June test, plaintiffs submitted the affidavit of Joe Lee Elm, Jr. Mr. Elm is the Laboratory Coordinator for the Clinic Based Studies, Family of Surveys, for the AIDS Research and Seroprevalence Program of the State of Hawaii Health Department. Elm Aff. ¶ 2. Mr. Elm reviewed the test data for blood tested by WBAMC on June 17 and 18, 1985, including Donor 30443's test. He concluded that the test runs conducted those days were invalid, most likely due to an error in test performance. Elm Aff. ¶¶ 4–5. In his opinion, no conclusion can be made as to the HIV status of Donor 30443 on June 17, 1985. Id. ¶ 7. Plaintiffs introduce further evidence to show that the technician who performed these tests received a three month suspension in 1984 for failure to follow standard operating procedures pertaining to the handling, processing, and release of blood. Pls.' Ex. Z. The government has not contradicted any of this evidence. Accordingly, the court finds there is a genuine factual dispute as to whether Donor 30443 was HIV negative in June 1985.

Because there is a genuine dispute over the meaning of L.B.'s negative test result and over the accuracy of Donor 30443's June 1985 test result, the court denies summary judgment on the issue of whether Donor 30443 was HIV negative in November 1984 when he donated the blood John Doe received.

### C. John Doe's HIV

The United States argues that John Doe could not have received HIV from his March 1985 blood transfusions because, as late as October 7, 1987, he was HIV negative. In support of this contention, they submit a WRAIR HIV database printout of his records showing a negative test result on that date. Def.'s Ex. 28. Plaintiffs concede that a negative test result in 1987 would conclusively establish that a 1985 blood transfusion did not cause the HIV. See Donegan Aff. ¶ 13.

Plaintiffs argue, however, that the October 7 test result is actually Jane Doe's record. The only evidence they submit in support of this contention is a copy of medical records of Jane Doe on October 7 (Pls.' Ex. AA at 2) and a medical record of an HIV test conducted October 7 with the name redacted (Pls.' Ex. AA at 1). Even if the medical record concerning the HIV test is Jane Doe's, this does *not* contradict the computer record submitted by the government regarding John Doe's test. It could very well be both Mr. and Mrs. Doe were tested.

Plaintiffs contend, however, that John Doe could not have tested at all on October 7 because he was out of the country and did not return until October 8. As evidence, they submit a copy of John Doe's passport with a visa stamp indicating he was admitted into the United States on October 8, 1987. Pls.' Ex. BB. The United States counters that such evidence is not inconsistent with the test result belonging to John Doe. According to the United States, an HIV test result may not show up on a patient's computer record under the date the blood was drawn. For example, John Doe tested HIV positive in October 1988, but on his WRAIR computer record, the test result is dated January 5, 1989. Def.'s Ex. 28; Def.'s Ex. 23. Thus, the court is told, the October 1987 test result could represent blood drawn months earli-

er. Nevertheless, the court finds that Doe's evidence, while of limited probative value, is sufficient to raise a genuine factual dispute about whether John Doe was HIV negative in 1987. Accordingly, the court denies summary judgment on this issue.

## II. CHILDREN'S EMOTIONAL DISTRESS CLAIMS

 Texas law allows both minor and adult children to recover for emotional distress resulting from a fatal injury to their parents. *Yowell v. Piper Aircraft Corp.*, 703 S.W.2d 630, 635 (Tex.1986); *Cavnar v. Quality Control Parking, Inc.*, 696 S.W.2d 549, 551 (Tex.1985). Texas law also allows family members to recover damages for negligent infliction of emotional distress when they witness a relative become seriously injured if they are closely related to the injured person and are in close proximity to the injury-causing event (the so-called "bystander" theory). *Freeman v. City of Pasadena*, 744 S.W.2d 923 (Tex.1988). The bystander theory is limited to cases where the plaintiff experiences the distress by witnessing a shocking accident or event. *Reagan v. Vaughn*, 804 S.W.2d 463 (Tex. 1990).

 The plaintiff children concede their cause of action does not fall strictly within the wrongful death or "bystander" theories of recovery. They submit, however, that their parents have been fatally injured and they are witnessing the slow deterioration, and eventual death,[9] of their parents caused by the negligence of the WBAMC. Texas law, plaintiffs argue, should thus be extended to allow the plaintiff children to assert their claims for emotional distress now, while their parents are still alive. The plaintiffs point out that, if their emotional distress claims are dismissed now, they will be permitted to file a new action for these damages upon the death of each parent. Such a result, they argue, would be a waste of judicial resources.

Under Texas law, nonbystander children cannot recover damages for infliction of emotional distress caused by a nonfatal injury to their parents. The Wrongful Death Act allows recovery of damages for the emotional distress that results from the *fact of death*—that is, actually losing a loved one. The "bystander" cases allow recovery of damages for the distress and shock of actually seeing a family member seriously injured. Watching someone slowly deteriorate does not fit into either of these two categories. There is a difference between witnessing a shocking event resulting in serious injury and watching a family member suffer a fatal illness. As defendants convincingly point out, California courts (where the "bystander" rule originated) do *not* allow recovery for observing a family member's slow death, even where the illness is caused by malpractice. *Budavari v. Barry*, 176 Cal. App.3d 849, 853–54, 222 Cal.Rptr. 446, 449 (1986); *Jansen v. Children's Hosp. Medical Ctr.*, 31 Cal.App.3d 22, 24, 106 Cal. Rptr. 883, 885 (1973).

The court finds that the plaintiff children have not stated a cause of action under either a wrongful death theory or a bystander theory. Additionally, the court declines to extend Texas law in the manner here requested. The court accordingly grants the United States' motion to dismiss the plaintiff children's emotional distress claims.

## CONCLUSION

For the reasons stated above, the court GRANTS IN PART and DENIES IN PART defendant's motion for summary judgment against all plaintiffs and GRANTS defendant's partial motion to dismiss the emotional distress claims of Jane Doe 2, John Doe 2, and John Doe 3.

IT IS SO ORDERED.

## ADDENDUM A

## CHRONOLOGY

November 26, 1984: Donor 30443 gives blood at WBAMC blood bank

---

**9.** Although both John Doe and Jane Doe are HIV positive, only John Doe has been diagnosed as having AIDS.

December 17, 1984: L.B. receives Unit 30443 packed red blood cells

March 22–27, 1985: John Doe receives blood transfusions of 22 units of blood from 22 different donors

Feb. 1985–June 1992: Twenty-one donors test HIV negative

June 17, 1985: Donor 30443 tests HIV negative

August 22, 1985: Donor 30443 tests positive for Hepatitis B and WRAIR records show Donor 30443 as HIV positive

March 1986: Donor 30443 tests HIV positive

October 7, 1987: John Doe allegedly tests HIV negative; Jane Doe allegedly tests HIV negative

October 26, 1988: John Doe tests HIV positive

December 1988: John Doe notified of his HIV positivity

January 5, 1989: John Doe's WRAIR record shows positive HIV test result

October 1989: Jane Doe tests HIV positive

April 1992: L.B. tests HIV negative