**Roberto C. QUIMING and Ester G. Quiming, Plaintiffs,**

v.

**INTERNATIONAL PACIFIC ENTERPRISES, LIMITED and AKC Corporation, Defendants.**

**Civ. No. 89–00979 HMF.**

United States District Court, D. Hawaii.

Dec. 4, 1990.

As Corrected Dec. 31, 1990.

Wayne D. Parsons, Honolulu, Hawaii, for plaintiffs Roberto C. and Ester G. Quiming.

Dean H. Robb and David P. Ledger of Carlsmith Ball Wichman Murray Case Mu-kai & Ichiki, Honolulu, Hawaii, for defendants Intern. Pacific Enterprises, Ltd. and AKC Corp.

## ORDER GRANTING DEFENDANT AKC CORPORATION'S MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT INTERNATIONAL PACIFIC ENTERPRISES, LIMITED'S MOTION FOR SUMMARY JUDGMENT

FONG, Chief Judge.

### INTRODUCTION

On November 26, 1990, the court heard defendants' two motions for summary judgment. Defendant AKC Corporation (hereinafter "AKC) has filed a motion for summary judgment on all counts. Defendant International Pacific Enterprises, Limited (hereinafter "IPEL") has filed a motion for summary judgment on IPEL's counterclaim and against Plaintiff on Count III of the plaintiffs' complaint.

### BACKGROUND

Plaintiffs Roberto Quiming and Ester Quiming, husband and wife, filed their complaint against defendants AKC and IPEL on December 21, 1989. Mr. Quiming claims that on December 28, 1988 he was injured while employed as a deck hand aboard the F/V Alaskan Hero. Mr. Quiming contends that both defendants are thus liable for damages under 46 U.S.C.App. § 688 *et seq.* (the "Jones Act") and the general maritime law. He also contends that both are liable for maintenance and cure. Mr. Quiming finally asserts that defendants are also liable for damages for loss of consortium.

On November 8, 1988, Mr. Quiming applied for a job with IPEL as a deck hand, interviewing with Mr. Jonathan Yoke, President of both AKC and IPEL. In connection with Quiming's application for employment, and to determine his fitness for sea duty, IPEL states that it would normally have required Mr. Quiming to complete the standard company medical questionnaire at

the same time he applied for the job. Defendant claims that because thirty to thirty-five applicants were applying for jobs at the same time, Mr. Quiming could not complete the questionnaire during the November 8, 1988 interview.

Two weeks later he had a second interview with the fishing master of the Alaskan Hero, Mr. Abe, whom Mr. Quiming understood to be an employee of AKC.

On November 28, 1988, Mr. Quiming signed an Employment Agreement to work as a Deck Hand on the vessel M/V Alaskan Hero. The contract specified a term of employment of one year, from December 22, 1988 to December 22, 1989.

The contract identified IPEL as "employer" and was signed by Jonathan D. Yoke, its Vice–President. On June 15, 1987, approximately one and one half years before IPEL employed Mr. Quiming, AKC and IPEL entered into a bare boat charter party agreement. Under the terms of the charter, AKC chartered the Alaskan Hero to IPEL and IPEL warranted and agreed that the vessel "as of the date hereof is in all respect seaworthy." Defendant AKC's motion, Ex. B.

As of November 28, 1988, Mr. Quiming considered himself to be an employee of AKC and IPEL. Mr. Quiming was flown to Japan on or about December 19, 1988. Upon arrival at the airport he and other crew members were taken by bus to the vessel.

On the bus Mr. Quiming and the other crew members were given a form which Mr. Quiming claims he thought was a "questionnaire" and which defendants claim was a "job application form." The form asked specifically: "Have you ever had or have you now [any of the following ailments]," and contained the instruction: "Please check at left of each item." Mr. Quiming checked "No" for "Back Trouble." The questionnaire also stated: "I have read the attached questionnaire carefully and answered it accurately. I represent and warrant that I am fit for duty, that I have no known physical disabilities, illnesses, or injuries at the present time, except for the following: ..." Mr. Quiming did not write anything in the blanks on the questionnaire following this statement.

In February of 1978, Mr. Quiming had sustained a compression fracture of the lumbar spine when a car in which he was a passenger hit a utility pole. Mr. Quiming was hospitalized at Tripler Army Medical Center for approximately one month. At that time Mr. Quiming was in the military. Upon release from Tripler, Mr. Quiming returned to work on "light duty" status for 90 days and then reassumed his normal duties.

Mr. Quiming states that he never had trouble with his back after that incident. He asserts his that 1978 back injury was minor and had healed by 1988 when he filled out the form on the bus.

On December 25, 1988, the Vessel left port in Japan and headed out to sea. Mr. Quiming performed the usual and customary duties of a deck hand thereon. On December 28, 1988, after Mr. Quiming had finished working a double-shift, he was instructed to report to the vessel's engine storage room area to assist others in moving various spare parts. As Mr. Quiming and Ernesto Agnir were carrying a large cast iron cylinder, weighing approximately 100 pounds, Mr. Quiming lost his footing and injured his back.

After injuring his back, Mr. Quiming reported his injury to the vessel's interpreter, Sam Abe, and to the vessel's American engineer, whose name is presently unknown. Despite notice of Mr. Quiming's injury, the American engineer instructed Mr. Quiming to continue working and moving spare parts. Mr. Quiming complied with this instruction until he could no longer bend due to stiffness and pain in his back.

Mr. Quiming was unable to receive care and treatment from a medical doctor until he arrived in Honolulu on January 29, 1989. On that day he went to the Honolulu offices of AKC and reported the accident and his injuries to Jonathan Yoke. Mr. Yoke informed Mr. Quiming that he could consult a doctor for treatment. Since then Mr. Quiming has been receiving medical/reha-

bilitative care since the date of the accident and has not been medically cleared for a return to work.

During the period December 1989 to January 15, 1990, Mr. Quiming received maintenance payments of approximately $382.50 per week. These maintenance payments were made by AKC, drawn on its checking account with First Hawaiian Bank. Mr. Quiming claims that he was given the impression by AKC personnel, including Jonathan Yoke, that AKC was monitoring and or handling his claims arising out of the December 28 incident.

The maintenance payment ceased after January 15, 1990. On February 6, 1990, plaintiff was informed by a woman at AKC whom he believed was named "Katrina Akana", who informed him that he would not be receiving further maintenance because he had filed a lawsuit against AKC. AKC also ceased payment of medical rehabilitative expenses incurred by Mr. Quiming.

Defendants' counsel informed plaintiffs' counsel that payment rendered prior to January 17, 1990 was "consistent with our position concerning maximum cure." Plaintiffs claim that defendants thus at least acknowledged responsibility for maintenance and cure until that date, and that defendants intended to pay medical bills incurred prior to January 17, 1990.

On June 28, 1990, defendants' counsel stated that they were not obligated to pay any additional maintenance and cure, due to newly discovered facts and the applicable law.

### Standard of Review

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment shall be entered when:

> ... the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

The moving party has the initial burden of "identifying for the court those portions of the materials on file that it believes demonstrate the absence of any genuine issue of material fact." *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir.1987), *citing Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). The movant must be able to show "the absence of a material and triable issue of fact," *Richards v. Neilsen Freight Lines*, 810 F.2d 898, 902 (9th Cir.1987), although it need not necessarily advance affidavits or similar materials to negate the existence of an issue on which the non-moving party will bear the burden of proof at trial. *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2553. *But cf.*, *id.*, 477 U.S. at 328, 106 S.Ct. at 2555–56 (White, J., concurring).

If the moving party meets its burden, then the opposing party may not defeat a motion for summary judgment in the absence of any significant probative evidence tending to support his legal theory. *Commodity Futures Trading Comm'n v. Savage*, 611 F.2d 270, 282 (9th Cir.1979). The opposing party cannot stand on his pleadings, nor can he simply assert that he will be able to discredit the movant's evidence at trial. *See T.W. Elec.*, 809 F.2d at 630. Similarly, legal memoranda and oral argument are not evidence and do not create issues of fact capable of defeating an otherwise valid motion for summary judgment. *British Airways Bd. v. Boeing Co.*, 585 F.2d 946, 952 (9th Cir.1978), *cert. denied*, 440 U.S. 981, 99 S.Ct. 1790, 60 L.Ed.2d 241 (1979). Moreover, "if the factual context makes the nonmoving party's claim *implausible*, that party must come forward with more persuasive evidence than would otherwise be necessary to show that there is a genuine issue for trial." *California Architectural Bldg. Products, Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1468 (9th Cir.1987), *citing Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (emphasis in the original).

■ The standard for a grant of summary judgment reflects the standard governing the grant of a directed verdict. *See Eisenberg v. Insurance Co. of North America,* 815 F.2d 1285, 1289 (9th Cir. 1987), *citing Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). Thus, the question is whether "reasonable minds could differ as to the import of the evidence." *Id.*

■ However, when "direct evidence" produced by the moving party conflicts with "direct evidence" produced by the party opposing summary judgment, "the judge must assume the truth of the evidence set forth by the nonmoving party with respect to that fact." *T.W. Elec.,* 809 F.2d at 631. Also, inferences from the facts must be drawn in the light most favorable to the non-moving party. *Id.* Inferences may be drawn both from underlying facts that are not in dispute, as well as from disputed facts which the judge is required to resolve in favor of the non-moving party. *Id.*

## DISCUSSION

### I. *IPEL's motion for summary judgment*

IPEL has moved for summary judgment on its counterclaim and against Mr. Quiming on Count III of plaintiffs' complaint. Count III of the complaint alleges that the defendants are liable for maintenance and cure. IPEL's counterclaim against Quiming is to recover the $30,369.67 it has paid for maintenance and cure. This counterclaim is based on recently discovered facts that defendants allege establish that Mr. Quiming was never legally entitled to receive any maintenance and cure.

■ IPEL argues that when "the shipowner requires a seaman to submit to a pre-hiring medical examination or interview and the seaman intentionally misrepresents or conceals material medical facts, the disclosure of which is plainly desired, then he is not entitled to an award of maintenance and cure." *McCorpen v. Central Gulf Steamship Corporation,* 396 F.2d 547 (5th Cir.1968). However, where the shipowner does not require a pre-employment medical examination or interview, a seaman must disclose a past illness or injury only when in his own opinion the shipowner would consider it as a matter of importance. The shipowner must then persuade the court or jury that the seaman could reasonably be expected to have considered his medical history a matter of importance; otherwise the shipowner will be liable for maintenance. *Id.*

■ Plaintiff argues that during his two interviews in Honolulu by Mr. Yoke and the fishing master should not qualify as interviews required under the *McCorpen* standard. Plaintiff states that since he was not asked about any prior injuries during these interviews he should be held only to the lesser of the two *McCorpen* standards.

Plaintiff also contends that since he was only asked about his health status when he filled out the questionnaire on the bus trip in Japan, plaintiff contends that IPEL did not consider his health status a "matter of importance".

Therefore, under the lesser of the two *McCorpen* standards, plaintiff would only need to show that he should not have reasonably been expected to have considered his prior back injury a matter of importance. Plaintiff argues that he had a good-faith belief that his previous injury was not of importance.

IPEL replies that Quiming's acts were intentional and that he deliberately concealed his previous injury. Mr. Quiming stated in his deposition that he read the questionnaire carefully, answered it accurately, and stated that he had no known disabilities. Mr. Quiming's educational level (including one year of college) is such that there is no question of his ability to understand such a questionnaire.

IPEL cites *Wayne Caulfield v. Kathryn Rae Towing,* 1989 AMC 1769, 1989 WL 121586 (E.D.La.1989), in which the defendant in that suit failed to state that he had suffered a previous back injury on his job application form. The court stated that "[c]ourts construing *McCorpen* have held

that, to prevail on summary judgment dismissal of a maintenance and cure claim, an employer must prove: (1) that plaintiff intentionally misrepresented or concealed medical facts; (2) that the undisclosed facts were material to the employer's decision to hire the plaintiff; and (3) that a connection exists between the withheld information and the injury complained of in the instant suit." *Wayne Caulfield* at 1771.

Since defendant in *Wayne Caulfield* had signed the application stating that he had filled out the form completely and truthfully, the court concluded that he intentionally misrepresented his medical history. The court in *Wayne Caulfield* made no mention of a pre-employment medical examination or interview.

Mr. Quiming has cited no case law in support of his contention that a questionnaire specifically asking about an employee's medical history should not qualify as a medical examination or interview as required by *McCorpen*. The policy underlying *McCorpen* is clearly that employees should not be held to a higher standard of disclosure if employers choose not to make specific inquiries about the employee's health.

Even if the questionnaire did not constitute an medical examination or interview, it should have been clear to Mr. Quiming that the questionnaire reflected IPEL's interest in all of the areas mentioned in the questionnaire and was unquestionably a matter of importance. Mr. Quiming does not have the benefit of claiming that the questionnaire was too broad and ambiguous; as stated above, the questionnaire asked specifically about "back trouble". As recently as 1988, Mr. Quiming had received a notice from the VA in which the VA stated that his back condition disability had been reduced from 20% to 10%. Mr. Quiming cannot therefore claim that he was in any way unaware of the continuing presence of his disability.

Previous to this 1988 notice, Mr. Quiming had also been examined by Dr. James Oda in 1986 because plaintiff had difficulty finding employment due to employers' concern about his ability to do the work. Dr. Oda

examined Mr. Quiming's back at this time and stated that the previous compression fracture seemed "fairly well healed." Plaintiff cannot rely on the current status of his healed fracture, however, since the questionnaire clearly asked if he had *ever* had back trouble.

■ Finally, Mr. Quiming argues that the area of the earlier injury is different that the present injury, so that there is no causal relationship between the two injuries, as set out by the *Wayne Caulfield* court. Plaintiff states that the injury in 1978 was to the L2 lumbar vertebrae, whereas the new injury was to the L4–5 and L–5–S1 discs. Plaintiff ignores the report of Dr. Robert Langen, an orthopedic surgeon at Hawaii Permanente Medical Group, who examined plaintiff at defendant's request on May 19, 1990.

Dr. Langen stated that plaintiff's previous L2 compression fracture would indicate a 7% impairment. Plaintiff's current injury indicated an additional 18% disability. Plaintiff's overall disability is now 25%. Dr. Langen assigned 60% of the 18% additional disability to the accident of December 28, 1988; the other 40% is assigned to previous existing factors, including the previous back injury in 1978. Dr. Langen has also stated in his affidavit that, in his opinion, the injury to Mr. Quiming's spine in 1978 is directly related to, and was a substantial cause of, the present injury to the L4–5 level of Mr. Quiming's back. Thus, any attempt by plaintiff to differentiate the present injury from his previous injury must fail; there is no requirement that a present injury be identical to a previous injury. All that is required is a causal link between the preexisting disability that was concealed and the disability incurred during the voyage. *McCorpen* at 549.

Defendant has therefore successfully shown that plaintiff's cause of action must be barred as against IPEL, since defendant failed to disclose material medical facts, the disclosure of which was plainly desired by defendant.

Defendant has also moved for attorney's fees and costs. As defendant has cited no authority for the court to award such attor-

ney's fees, this court finds no compelling reason to grant the same. The court will, however, consider costs to defendant as a prevailing party at the end of the litigation.

Accordingly, the court GRANTS defendant International Pacific Enterprises, Ltd.'s motion for summary judgment on IPEL's counterclaim in the amount stated above, and against plaintiff Roberto Quiming on Count III of the plaintiff's complaint, with costs but without attorney's fees.

## II. *AKC's motion for summary judgment*

Defendant AKC Corporation claims that it is entitled to summary judgment on all of plaintiffs' claims for the following reasons:

(1) Since co-defendant IPEL, not AKC, was Mr. Quiming's Jones Act employer, AKC cannot be liable to Mr. Quiming under the Jones Act.

(2) AKC cannot be liable to Mr. Quiming for maintenance and cure because that responsibility, if any, is solely that of his employer, IPEL.

(3) AKC cannot be liable for the alleged unseaworthiness of the Alaskan Hero because co-defendant IPEL was the bare boat charterer of the vessel at all times relevant to this action.

(4) Since a cause of action for loss of consortium cannot be brought under the Jones act but only under common law unseaworthiness against the owner pro hac vice of the vessel, which is IPEL, Mrs. Quiming's claim against AKC cannot stand.

### A. Plaintiff's Jones Act Claim

Section 688 of the Jones Act grants seamen who are injured during the course of employment the right to sue their employer for negligence under the statute. However, this statute applies only to employers and their employees. *Cosmopolitan Shipping v. McAllister*, 337 U.S. 783, 790, 69 S.Ct. 1317, 1321, 93 L.Ed. 1692 (1948).

Defendant cites *In Jemeqbe v. J.R. McDermott*, 1980 AMC 884 (5th Cir.1979), in which the court granted a movement for summary judgment filed by defendant McDermott against the estate of Jemeqbe, a seaman who had fallen overboard and drowned. Plaintiff in McDermott had claimed that Niger Benue Transport Company and McDermott had been engaged in a joint venture and although plaintiff had been employed primarily by Niger, both companies should be liable. The court found that since Niger was the sole operator of the vessel and McDermott exerted no control and had no right of control of the crew, summary judgment was appropriate. The court went on to state that absent a showing of an employer-employee relationship, a Jones act claim may not survive.

AKC states that the employment agreement that Mr. Quiming signed on November 28, 1988 clearly identified IPEL as plaintiff's sole employer. On June 15, 1987, AKC and IPEL entered into a bare boat charter party agreement. In this agreement, AKC is listed as "owner" and IPEL is listed as "Charterer".

Plaintiff argues that he considered himself to be employed or co-employed by AKC during the time at issue based upon his work experience while on the vessel, his communications with and representations made by Jonathan D. Yoke, and the course of conduct of Yoke and/or AKC Corporation. Plaintiff filled out his accident report on a form entitled "AKC Corporation Master's Report of Loss." Upon return to Hawaii, plaintiff went to the Honolulu office of AKC and reported the accident to Mr. Yoke, who then told him to visit a doctor for medical care. All of plaintiff's maintenance payments were made via checks drawn on the account of AKC Corporation.

During discovery plaintiff found that the officers and directors of IPEL are:

| | | |
|---|---|---|
| Jonathan Yoke | President | Director |
| Masami M. Aizawa | Vice–President | Director |
| Inao Aizawa | Asst. V. Pres. | |
| Moto Sakurai | Sec. Treas. | Director |

The officers and directors of AKC Corporation are:

| | | |
|---|---|---|
| Jonathan Yoke | President | Director |
| Masami Aizawa | Vice–President | Director |
| Moto Sakurai | Sec./Treas. | |
| Judy Montagna | | Director |

AKC has stated that it assists IPEL in locating suitable outside employees for the operation of the vessel. Plaintiff argues that AKC and IPEL are so intertwined in corporate structure that they are one and the same corporation simply using different names, so that the court should consider them both to be employers of plaintiff.

Defendant AKC responds by stating that the law requires that

"there must be something more than the identity of officers as well as stock ownership in corporate set-ups in order to disregard the corporate fiction. In order to brush it aside it must appear that it was organized for a fraudulent purpose or that some injury has resulted to someone from this transaction, something of fraud, something of illegality or wrongdoing, or something that the moving party has cause for complaint in connection with the transaction."

Defendant states that plaintiff has no evidence to show any fraudulent purpose whatsoever. Although both AKC and IPEL have a presence in Honolulu, AKC states that this is only to the extent that AKC has an agency agreement with IPEL under the terms of which AKC recruits employees from Hawaii for employment with IPEL.

Defendant AKC cites *Williams v. McCallister Brothers, Inc.*, 534 F.2d 19 (2nd Cir.1976), in which plaintiff, an injured seaman, brought an action against the owner of the vessel. The vessel was bareboat charted to and operated by Port San Juan Towing Company (hereinafter "PSJT"), a Puerto Rico Corporation. McCallister was a New York corporation which wholly owns PSJT, its subsidiary.

The *Williams* court rejected plaintiff's argument that McCallister was in fact plaintiff's employer, stating that plaintiff must prove that McCallister actually dominated PSJT such that PSJT had no existence of its own and that McCallister used the corporate existence of PSJT to perpetrate a fraud, resulting in a loss to the claimant. *Williams* at 21. Since plaintiff in the instant case has shown no illegal or fraudulent purpose or conduct by AKC, plaintiff's Jones Act claim against AKC must fail in light of the employment contract explicitly identifying IPEL as plaintiff's employer.

Although it is true that plaintiff's maintenance checks were drawn on AKC's account, plaintiff still has not shown the requisite fraud to allow the two corporations to be considered as one. AKC has stated that it made these payments pursuant to an agency agreement with IPEL, and discontinued payment when it was determined in good faith that, under the law, further payments were not required. AKC seeks no reimbursement for past maintenance paid through January 17, 1990, the date at which payment was discontinued.

## B. Plaintiff's Unseaworthiness Claim

 Liability for unseaworthiness arises out of ownership, not the employer-employee relationship. *Baker v. Raymond Intern., Inc.*, 656 F.2d 173 (1981). However, AKC states that plaintiff's unseaworthiness claim must fail because an owner of a vessel is not liable for unseaworthiness originating and causing injury while a bare boat charterer is operating a ship. *Reed v. Steamship Yaka*, 307 F.2d 203, 206 (3rd Cir.1962), *rev'd on other grounds*, 373 U.S. 410, 83 S.Ct. 1349, 10 L.Ed.2d 448; *accord, Kerr–McGhee Corp. v. Laurel*, 479 F.2d 61 (4th Cir.1973).

The duty to provide a seaworthy vessel is a personal obligation, which would be reduced to pure fiction if it were extended to include conditions arising during a demise charter, when the owner has no right to control and no opportunity to correct defects. *Ramos v. Beauregard, Inc.*, 423 F.2d 916, 918 (1st Cir.1970).

Since AKC bare boat chartered the Alaskan Hero to IPEL on June 15, 1987, it argues that it cannot be liable for Mr. Quiming's injury which took place eighteen months later, on December 28, 1988. Plaintiff has cited no law whatsoever to contradict defendant's contentions, nor has it stated any facts which would change this court's determination of the situation. Plaintiff only argues that the shipowner's liability for failure to furnish a seaworthy

vessel is a species of liability without fault and is not limited by conceptions of negligence. *Seas Shipping Co. v. Sieracki*, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946), *reh'g. den.*, 328 U.S. 878, 66 S.Ct. 1116, 90 L.Ed. 1646 (1946). However, plaintiff fails to address the argument that the shipowner's liability may be cut off after a bare boat charter. Accordingly, summary judgment is granted on the cause of action alleging liability for unseaworthiness on the part of AKC.

**C. AKC's liability for continued maintenance and cure**

 Liability for maintenance and cure are the particular responsibility of the employer. "Maintenance, cure and wages remain … the particular responsibility of the employer …" *Baker* at 185. As plaintiff has failed to show that AKC was plaintiff's employer, this cause of action must fail.

**D. AKC's liability to Mrs. Quiming for loss of consortium**

 Causes of action for loss of consortium must be derived from common law unseaworthiness, because the Jones Act does not provide for the recovery of these types of damages. *Simeon v. T. Smith & Son, Inc.*, 852 F.2d 1421, 1432 at n. 13 (5th Cir.1988). As this court has found that Mr. Quiming has no claim for unseaworthiness against AKC, AKC is therefore not liable to Mrs. Quiming for her claim which depends upon her husband's underlying claim.

Accordingly, the court GRANTS defendant AKC's motion for summary judgment on all counts, and, as stated in the first section of the discussion, GRANTS defendant International Pacific Enterprises, Ltd.'s motion for summary judgment on IPEL's counterclaim and against plaintiff Roberto Quiming on Count III of the plaintiff's complaint, with costs but without attorney's fees.

IT IS SO ORDERED.